# Douglas Christopher Thomas

## v.

# Commonwealth of Virginia

Record No. 911850

June 5, 1992

Present: All the Justices

*Damian T. Horne (Sydney K. L. West; Horne & West,* on brief), for appellant.

*Robert Q. Harris, Assistant Attorney General (Mary Sue Terry, Attorney General,* on brief), for appellee.

CHIEF JUSTICE CARRICO delivered the opinion of the Court.

On January 23, 1991, Douglas Christopher Thomas, then seventeen years of age, appeared in juvenile court charged with first degree murder in the killing of James Baxter Wiseman, II, Code § 18.2-32, and with capital murder in the killing of Kathy J. Wiseman as a part of the same act or transaction of killing James Baxter

Wiseman, II, Code § 18.2-31(7).[1] Thomas was also charged with two offenses of using a firearm in the killing of the victims. Code § 18.2-53.1.

In a written instrument signed by Thomas and his counsel, Thomas waived both a preliminary hearing and a transfer hearing. As a result, the matter was transferred to circuit court, where, on January 28, 1991, Thomas was indicted for the four offenses with which he had been charged in juvenile court.

Trial on all four charges was set for May 29, 1991, and then continued to August 21 of the same year. Upon arraignment on August 21, Thomas entered pleas of guilty to the charges of first degree murder and use of a firearm in the killing of Mr. Wiseman and pleas of not guilty to the charges of capital murder and use of a firearm in the killing of Mrs. Wiseman.

The trial court announced that it would accept Thomas's pleas of guilty to the charges involving the death of Mr. Wiseman and that it would order a pre-sentence report with respect to those charges. The trial court also accepted Thomas's pleas of not guilty to the charges involving Mrs. Wiseman's death, and trial proceeded before a jury on those charges.

In the first phase of the trial, the jury convicted Thomas of capital murder and use of a firearm in the commission of the killing of Kathy Wiseman and fixed punishment on the weapons charge at four years in the penitentiary. In the second phase, the jury fixed Thomas's punishment for capital murder at death, based upon a finding of "vileness."

Following receipt of the report of a probation officer, the trial court held a sentencing hearing and imposed the sentences fixed by the jury in the death of Mrs. Wiseman. At the same hearing, the court sentenced Thomas to sixty-five years' imprisonment for the first degree murder of Mr. Wiseman and two years' imprisonment for the use of a firearm in that killing.

Thomas is before this Court for automatic review of his death sentence, and we have consolidated that review with the appeal of his capital murder conviction.[2] Code § 17-110.1. In accordance with Code § 17-110.2, we have given the matter priority on our docket.

---

[1] Under Code § 18.2-31(7), the willful, deliberate, and premeditated killing of more than one person as a part of the same act or transaction is capital murder.

[2] Thomas has not appealed any of his non-capital convictions.

## THE FACTS

The record shows that Thomas lived with his aunt and uncle, Brenda and Herbert Marshall, at Piankatank Shores in Middlesex County. Lanie Creech, Mrs. Marshall's twelve-year-old niece, also lived in the home.

Thomas had been involved for some time in a "[v]ery intimate" relationship with fourteen-year-old Jessica Wiseman, who lived with her parents, "J. B." and Kathy Wiseman, several blocks from the Marshall residence. Jessica's parents were threatening to break up the relationship. Jessica had been wearing Thomas's class ring "for a long time," but Mrs. Wiseman made Jessica "give it back." Some three months before the murders occurred, Jessica was heard to say that she "wished to get rid of [her parents]."

Mr. and Mrs. Wiseman were murdered in the early morning hours of November 10, 1990, a Saturday. On the preceding Tuesday, Lanie Creech overheard a conversation between Thomas and Jessica in which the two discussed "[g]etting rid of her parents." Jessica asked Thomas "if he had enough bullets," and he replied in the affirmative. He asked Jessica "what time he should come over." She replied, "[m]idnight," and said that "if the window is down to go away . . . it's off" but "if the window is up to come on in."

On Thursday evening, Lanie had a conversation with Thomas. She asked him why "he was so nervous." He replied that he had "to kill two people, and that he was real nervous." On Friday evening, just before midnight, Lanie observed Thomas putting on camouflage clothing and saw that he had a shotgun. He told Lanie the plan was that "after the shootings were over," he was to return home, "go in through his window and act like he was sleeping." Jessica would then come and "bang on the door."

Thomas and Lanie left the house together and walked to a nearby recreation area, where he smoked some "pot" and told Lanie he was "going over to Jessica's . . . [t]o kill two people." With Lanie carrying the shotgun, the two walked to a point "a few hundred feet away from [Jessica's] house." Lanie then returned home.

Later, Mrs. Marshall was awakened by someone "banging on the door." Lanie opened the door, and Jessica ran straight to Mrs. Marshall's bedroom, screaming that "someone had shot her father and that her mother was dead." Thomas was in his bedroom, and Mrs. Marshall asked him to "get dressed" and comfort Jessica while she called "the authorities."

Don F. Rhea, deputy sheriff of Middlesex County, was dispatched to the Wiseman home, and he arrived on the scene at 4:27 a.m. He entered through the unlocked front door and discovered the bodies of Mr. and Mrs. Wiseman.

Later in the day, Special Agent Larry A. Johnson of the Virginia State Police conducted two interviews with Thomas at the Marshall house. In the second interview, Thomas confessed to killing Mr. and Mrs. Wiseman.

## PRETRIAL MATTERS

### *Transfer Hearing*

Following Thomas's waiver of the transfer hearing and his indictment in circuit court, Benton H. Pollok, his court-appointed attorney, was relieved as counsel in the case. The trial court appointed new counsel, who moved to remand the proceeding to juvenile court "for a full and impartial transfer hearing." The trial court denied the motion.

■ Thomas recognizes that in *Stanford* v. *Kentucky*, 492 U.S. 361 (1989), the Supreme Court held that the imposition of capital punishment upon a person who commits murder at the age of 16 or 17 does not constitute cruel and unusual punishment under the Eighth Amendment. Yet, Thomas argues that a transfer hearing is necessary to "provide the individualized consideration that the Constitution requires before a state may impose the death penalty" upon a juvenile and, therefore, that a transfer hearing cannot be waived.

■ As the Attorney General points out, however, the Constitution "does not require juvenile transfer hearings nor does it require additional procedural safeguards for juveniles tried [for] capital crimes." Besides, Virginia's death penalty statutes provide for individualized consideration of all those tried on capital charges, with "the age of the defendant at the time of . . . the capital offense" a statutorily prescribed mitigating factor the jury may consider in determining whether to fix punishment at death or life imprisonment. Code § 19.2-264.4(B)(v).

■ Thomas argues further that the juvenile transfer statute, Code § 16.1-270, does not permit a juvenile charged with capital murder to waive the jurisdiction of the juvenile court and have his case transferred to circuit court. The Code section provides in pertinent part:

> At any time prior to commencement of the adjudicatory hearing, a child fifteen years of age or older charged with an offense which if committed by an adult could be punishable by confinement in a state correctional facility, with the written consent of his counsel, may elect in writing to waive the jurisdiction of the juvenile court and have his case transferred to the appropriate circuit court . . . .

Thomas says the waiver provision, by its "plain language," applies only to offenses that are punishable by confinement in a state correctional facility and not to those punishable by death. We disagree with Thomas. While capital murder may be punishable by death, it "could be" punishable by imprisonment for life in a state correctional facility. Code § 19.2-264.4. Hence, the waiver provision is clearly applicable where a juvenile is charged with a capital offense.

### Double Jeopardy

Immediately after Thomas entered his plea of guilty to first degree murder in the death of Mr. Wiseman, he moved to dismiss the capital murder charge on the ground that its prosecution would constitute double jeopardy. The trial court denied the motion.

Thomas contends the trial court erred in denying his motion to dismiss. He cites *Grady* v. *Corbin*, 495 U.S. 508 (1990). In that case, following a fatal collision, Corbin was given traffic tickets charging him with driving while intoxicated and failing to keep to the right of the median. He plead guilty to these charges in town court. Subsequently, based upon the same conduct, a county court grand jury indicted Corbin for reckless manslaughter. His motion to dismiss the indictment on double jeopardy grounds was denied, and he sought a writ of prohibition. The lower court denied the writ, but the New York Court of Appeals reversed, holding that prosecution of the manslaughter indictment would constitute double jeopardy. 495 U.S. at 514-15.

Affirming, the Supreme Court of the United States held that, even though a second prosecution may not be barred by the test

enunciated in *Blockburger* v. *United States*, 284 U.S. 299 (1932),[3] a second prosecution is barred ''if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted.'' *Corbin*, 495 U.S. at 510.

Thomas argues that an essential element of his prosecution for capital murder was the killing of more than one person. In establishing that element, Thomas submits, the Commonwealth had to prove the killing of Mr. Wiseman, this being the same conduct the Commonwealth used to support the first degree murder charge, for which, Thomas says, he had already been prosecuted. Hence, Thomas concludes, the prosecution for capital murder was barred under *Corbin*.

█ Thomas's argument suffers from a fatal flaw, namely, that *Corbin* does not apply to the situation at hand. It is applicable only where, in a *subsequent* prosecution, conduct previously prosecuted is used to establish an essential element of an offense which is the subject of the second trial. *Corbin*, 495 U.S. at 510; *United States* v. *Luskin*, 926 F.2d 372, 377 (4th Cir.), *cert. denied*, ___ U.S. ___, 112 S.Ct. 68 (1991). *Corbin* has no application where the same conduct is used to support more than one conviction in a single proceeding; indeed, the Supreme Court stated that ''[w]ith adequate preparation and foresight, the State could have prosecuted Corbin for the offenses charged in the traffic tickets and the subsequent indictment in a single proceeding, thereby avoiding this double jeopardy question.'' *Corbin*, 495 U.S. at 524.

█ Here, Thomas was prosecuted in a single proceeding for both of the murder charges involving the Wisemans. In such a setting, '' 'the role of the constitutional guarantee [against double jeopardy] is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense.' '' *Blythe* v. *Commonwealth*, 222 Va. 722, 725, 284 S.E.2d 796, 798 (1981) (quoting *Brown* v. *Ohio*, 432 U.S. 161, 165 (1977)). In *Woodfin* v. *Commonwealth*, 236 Va. 89, 372 S.E.2d 377 (1988), *cert. denied*, 490 U.S. 1009 (1989), a prosecution for capital murder involving the killing of ''more than one person as a part of the same act or transaction'' under Code § 18.2-31(g) (now Code

---

[3] Under *Blockburger*, the second of two prosecutions is not barred if each offense ''requires proof of a fact which the other does not.'' *Blockburger* v. *United States*, 284 U.S. 299, 304 (1932).

§ 18.2-31(7)), we held that the trial court had not exceeded its legislative authorization by imposing life sentences for both the "gradation crime" and the capital murder conviction. *Woodfin*, 236 Va. at 97, 372 S.E.2d at 382. We make the same holding here.

### Change of Venue

Thomas contends the trial court erred in refusing to order a change of venue. He says that Middlesex County was "bombarded by pre-trial publicity" and, therefore, that he could not receive a fair trial in the county.

In a hearing on the change-of-venue motion, Thomas submitted the testimony of Dr. Donald Hugh Smith, Associate Professor in the Department of Sociology and Criminal Justice at Old Dominion University. Dr. Smith testified that, from a random survey he conducted, he found that between 96.3% and 99.3% of the "small population" of Middlesex County "readily recognized" the Thomas case.[4] He testified further that, of those surveyed, 38.7% expressed the opinion that Thomas was guilty, 1.4% thought he was innocent, and 59.8% expressed no opinion. Dr. Smith opined that between 35% and 57% of those expressing no opinion were "contaminated," meaning they were "more likely to convict than those who [were not subjected to the pretrial publicity]."[5]

Thomas contends Dr. Smith's testimony was uncontradicted "that the jury pool in Middlesex County was biased and that . . . Thomas could not receive a fair trial by a jury selected from that community." Hence, Thomas concludes, a change of venue was required.

We disagree. A review of the record reveals that Dr. Smith's testimony was contradicted. It was contradicted by affidavits the sheriff secured from 100 Middlesex residents, each of whom stated that he or she could give Thomas a fair and impartial trial. More important, the testimony was contradicted by the fact that a jury was selected with relative ease. It was necessary to examine on voir dire

---

[4] According to the 1990 Census Report, the population of Middlesex County consists of 8,653 persons. 1991-92 Report of the Secretary of the Commonwealth 455.

[5] Other than general statements by Smith about "the kind of publicity that this case has had," Thomas did not introduce into evidence any newspaper articles or other matter to support his claim that Middlesex County was "bombarded" by pretrial publicity. However, Thomas attached thirteen newspaper articles to a trial memorandum he filed in support of his motion for change of venue. We have examined the articles and find them not inflammatory.

only fifty-one prospective jurors to secure a panel of twenty-one, from which twelve jurors and one alternate were chosen. Of the thirty excused for cause, only sixteen, or 31% of those examined, were disqualified because of preformed opinion or bias resulting from pretrial publicity, seven, or 13%, were discharged for opposition to the death penalty, and seven, or another 13%, were dismissed for other reasons.

The 31% figure, representing the sixteen prospective jurors dismissed because of pretrial publicity, compares favorably with the 20% dismissed for similar reasons in *George* v. *Commonwealth*, 242 Va. 264, 275, 411 S.E.2d 12, 18 (1991), *cert. denied*, 503 U.S. ___, 112 S.Ct. 1591 (1992), the 37.84% in *Greenfield* v. *Commonwealth*, 214 Va. 710, 717, 204 S.E.2d 414, 420 (1974), the 18% in *Wansley* v. *Commonwealth*, 210 Va. 462, 468, 171 S.E.2d 678, 682-83 (1970), and the 26% in *Beck* v. *Washington*, 369 U.S. 541, 556 (1962). In all four of these previous cases, motions for change of venue were denied by the trial courts, and the denials were affirmed on appeal.

 Thomas argues, however, reflecting the view of Dr. Smith, that voir dire examination of prospective jurors is inadequate to identify those who may have preformed opinions or bias as a result of pretrial publicity. We disagree with this view. Rather, we agree with what the trial judge said in denying the motion for change of venue: "[T]he best tool for searching for the truth is a voir dire examination conducted under oath in a judicial atmosphere in all its [inherent sublimity]."

 Whether venue should be changed is a matter within the sound discretion of the trial court, and its decision on the matter will not be disturbed on appeal in the absence of a showing of abuse. *Stockton* v. *Commonwealth*, 227 Va. 124, 137, 314 S.E.2d 371, 379, *cert. denied*, 469 U.S. 873 (1984). Furthermore, there is a presumption that a defendant can receive a fair trial in the county or city where the offense occurred. To overcome this presumption, the burden is upon the accused to establish clearly that "there is such a widespread feeling of prejudice on the part of the citizenry as will be reasonably certain to prevent a fair and impartial trial." *Coppola* v. *Commonwealth*, 220 Va. 243, 248, 257 S.E.2d 797, 801 (1979), *cert. denied*, 444 U.S. 1103 (1980).

 Thomas has shown neither an abuse of discretion nor the existence of a widespread feeling of prejudice among the citizenry of

Middlesex County. Accordingly, we hold that the trial court did not err in refusing to order a change of venue.

### Denial of Continuance

Upon Thomas's indictment by the grand jury on January 28, 1991, the trial court set the case for trial on May 29 of that year. As indicated previously, at the time of indictment, Benton Pollok was serving as Thomas's court-appointed counsel.

In an oral motion made April 5 and in a written motion filed April 9, Pollok moved for a continuance of Thomas's case. Pollok represented to the court that he had been retained to defend a murder case in Gloucester County, which was scheduled for a three-week trial commencing on April 22 and continuing to within two weeks of Thomas's trial date. Pollok also represented that an effort to secure a continuance of the other case had been unsuccessful and, hence, insufficient time would be left for Pollok to prepare for Thomas's trial, "thus causing ineffective representation of . . . Thomas."

At the conclusion of a hearing on the motion for continuance, the trial judge noted that Pollok knew of his involvement in the Thomas case at the time he accepted employment in the other matter and that it was obvious Pollok was "not going to be ready to try [Thomas's] case." The judge stated he would not continue the case but would allow Pollok to withdraw. "In fact," the judge said, "I am going to enter an order requiring him to withdraw and I am going to ask [Damian T. Horne] to take this case." In an order entered on April 16, the trial court denied the motion for continuance, "relieved" Pollok as court-appointed counsel for Thomas, and appointed Horne and Sydney K. L. West as co-counsel to represent Thomas.

Thomas acknowledges that an indigent has no right to counsel of his choice, but he contends the trial court erred "in denying [Pollok's] motion for a continuance and requiring [Pollok] to withdraw from the case in midstream." Pollok was not only the attorney of his choice, Thomas says, but also one he trusted and was familiar with, since Pollok had represented him on several previous occasions. There is "no acceptable reason," Thomas maintains, for discharging an experienced attorney who had been on the case for months and replacing him with attorneys who would not be fully prepared to participate in the adversarial fact-finding process.

We do not think the trial court erred in denying the motion for continuance. When the trial judge set the case for trial, he made it clear to counsel that he was setting the matter "far enough in advance so everyone would have plenty of time to prepare" and there would be no need for a continuance. Yet, with full knowledge of the situation, Pollok accepted employment in another case, admittedly jeopardizing his ability to prepare for trial of Thomas's case, and then expected the trial court to extricate him from his predicament by continuing the Thomas matter.

Furthermore, when the trial judge announced the appointment of Horne to replace Pollok, he asked Horne if there was "any doubt in [his] mind that [he could] fully represent [Thomas]." Horne replied: "No, sir." Nothing appears of record to indicate that Horne was unprepared for trial or that Thomas was prejudiced in any way by the denial of the motion for continuance. Indeed, all that Thomas has to say on the subject of prejudice is this vague sentence in his brief: "Obviously, replacement of counsel at such late date denies [a defendant the] opportunity to exercise his attorney-client relationship and schackles the very legal maneuvering of counsel."

Whether a continuance should be granted or denied is a matter within the sound discretion of the trial court, and a decision one way or the other will not be disturbed on appeal in the absence of a showing that the discretion has been abused. *Quintana* v. *Commonwealth*, 224 Va. 127, 135, 295 S.E.2d 643, 646 (1982), *cert. denied*, 460 U.S. 1029 (1983); *Shiflett* v. *Commonwealth*, 218 Va. 25, 30, 235 S.E.2d 316, 319 (1977). We find no abuse of discretion in the trial court's denial of a continuance in this case.[6]

### Admissibility of Confession

By pretrial motion, Thomas sought to suppress the confession he made to Special Agent Larry Johnson on the day of the murders. After a hearing, the trial court denied the motion.

In his confession, Thomas stated that, on the night in question, he went to Jessica's home and found her window open. He handed the shotgun to her through the window, then climbed through himself.

Jessica's parents were asleep. Thomas loaded the gun, and Jessica put it on her bed. He lay on the bed beside Jessica "a long time."

---

[6] Trial of the case was ultimately continued to enable the defense to seek psychiatric evaluation of Thomas. The order continuing the case set a new trial date of August 21, 1991.

Jessica then got a "box of drugs" and put it on the floor "to make it look like a drug rip off."

For about ten or fifteen minutes, Thomas and Jessica "sat talking about killing [her parents]." In "the very end," Thomas "didn't want to do it," but "[Jessica] said she wanted it done."

Thomas fired two shots at the Wisemans from the doorway of their bedroom, although, he claimed, he "really couldn't see [Mr. and Mrs. Wiseman]." He returned to Jessica's bedroom and was lying on the floor "on the opposite side of [the] bed" when Mrs. Wiseman appeared in the doorway. Jessica said: "Oh God Chris please shoot her again." Thomas shot her again.

Thomas contends that his confession was involuntary because he was only seventeen years old at the time of the offense,[7] was a high-school dropout, had slept only two hours in the forty-hour period preceding his interrogation, and was beset by people he thought held great ill will toward him. In addition, Thomas says, the police initiated all conversations, and he felt surrounded by authorities who obviously wanted him to confess.

Furthermore, Thomas continues, the testimony of Dr. Earl H. Williams, II, a clinical psychologist, confirmed that Thomas's ability to make an informed decision about waiving his *Miranda* rights had been compromised because he was "developmentally immature," was unable "to make decisions at an adult level," was "at the lower end" of the "average range of intellectual function," and was sleep-deprived. "It is unreasonable to believe," Thomas concludes, "that under these circumstances [his]confession . . . was obtained by anything other than coercion and duress."

We disagree with Thomas. The evidence at the suppression hearing shows that Special Agent Johnson, who took Thomas's confession, first talked to Thomas in the Marshall home about 2:00 p.m. on the afternoon of the murders. At that time, Johnson found Thomas "[v]ery alert and very calm."

After interviewing Jessica, Johnson returned to the Marshall home about 9:30 p.m. and questioned Thomas about his involvement in the murders. Mrs. Marshall, who was "acting as [Thomas's] guardian," was present during the entire interview, except for "a few seconds" when she went to the kitchen to get a drink of water. Thomas appeared alert and responsive, had no odor

---

[7] Thomas was born May 29, 1973. The offense occurred November 10, 1990.

of alcohol about him, had not had "anything to drink," and had not taken any drugs.

Before the interrogation commenced, Johnson gave Thomas the warnings required by *Miranda* v. *Arizona*, 384 U.S. 436 (1966), "very slow[ly] and very deliberate[ly]." Thomas stated he understood his rights, took time to read the waiver form for himself, and then signed it. Johnson testified that he made no threats to Thomas and offered him no promises. Mrs. Marshall confirmed this aspect of Johnson's testimony while she was on the witness stand.

The Commonwealth called Dr. Henry O. Gwaltney, Jr., a clinical psychologist, as a witness at the suppression hearing. Dr. Gwaltney was asked to state his conclusion "as to [Thomas's] capacity to understand his Miranda rights." The doctor replied it was his conclusion that Thomas had made the confession "knowingly[,] intelligently[,]and voluntarily."

In ruling the confession admissible, the trial court rejected Dr. Williams's testimony, accepted Dr. Gwaltney's, and found that Thomas was "sufficiently mature" to comprehend the *Miranda* warnings. The court found further that "the mandate of Miranda was certainly met"; that the required warnings were "clearly [and unequivocally] given"; and that the waiver of rights was in writing and signed by Thomas. The court also found there was no evidence that "the will of the interrogators was substituted for [the will of Thomas]" or that Thomas was "anything other than alert." The court concluded that Thomas's "rights were fully protected and that he made an effective[,] voluntary decision to make the statement he did."

In *Gray* v. *Commonwealth*, 233 Va. 313, 356 S.E.2d 157, *cert. denied*, 484 U.S. 873 (1987), we said:

> A defendant's waiver of his *Miranda* rights is valid only if the waiver is made knowingly, voluntarily and intelligently. *Miranda*, 384 U.S. at 475. Whether a statement is voluntary is ultimately a legal rather than factual question. *See Miller* v. *Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 450 (1985). Subsidiary factual [findings], however, are entitled to a presumption of correctness. *Id.* at 112, 106 S.Ct. at 451. The test to be applied in determining voluntariness is whether the statement is the "product of an essentially free and unconstrained choice by its maker," or whether the maker's will "has been overborne and his capacity for self-determination critically impaired."

*Schneckloth* v. *Bustamonte*, 412 U.S. 218, 225 (1973). In determining whether a defendant's will has been overborne, courts look to "the totality of all the surrounding circumstances," *id.* at 226, including the defendant's background and experience and the conduct of the police, *Correll* v. *Commonwealth*, 232 Va. 454, 464, 352 S.E.2d 352, 357 (1987); *Stockton* v. *Commonwealth*, 227 Va. [124,] 140, 314 S.E.2d [371,] 381 [, *cert. denied*, 460 U.S. 873 (1984)].

*Id.* at 324, 356 S.E.2d at 163. Guided by these standards, we hold the evidence amply supports the trial court's finding that Thomas's "rights were fully protected and that he made an effective[,] voluntary decision to make the statement he did." Accordingly, we will not disturb the court's finding.

### Destruction of Evidence

On August 6, 1991, approximately 2-1/2 weeks before trial, Thomas made a motion for "dismissal of all charges pending against him." The motion alleged that the Commonwealth had intentionally destroyed marijuana that had been found among Thomas's possessions even though the Commonwealth had information indicating "that [Thomas] had smoked marijuana laced with PCP" on the night of the murders.

The motion also alleged that the destruction of the marijuana constituted the willful concealment of evidence in violation of Thomas's due process rights under *Brady* v. *Maryland*, 373 U.S. 83 (1963). Other portions of the motion alleged that destruction of the marijuana deprived Thomas of evidence he could have used in defense of the charges against him and in mitigation of punishment. Finally, it was alleged that defense counsel had not learned about the marijuana until the day before the motion was filed. The trial court denied the motion.

Evidence taken at a hearing on the motion shows that around December 28, 1990, some six weeks after Thomas was arrested and incarcerated for the Wiseman murders, his aunt, Brenda Marshall, discovered in his closet a small plastic "baggie" containing green

plant material. Mrs. Marshall delivered the "baggie" to Dawn Alexander, an associate of Benton Pollok, who, at the time, was Thomas's court-appointed counsel.[8]

Ms. Alexander turned the "baggie" over to the sheriff. She explained to him the circumstances surrounding its discovery and told him she thought there was "some possibility it might have some bearing on [Thomas's] mental state at the time of the crime." Ms. Alexander also told Pollok about the discovery of the marijuana. The sheriff informed the Commonwealth's Attorney of his receipt of the "baggie" and recommended that it be destroyed because it was not "evidence [of] any crime or [related to] any suspect" and did not have "any legitimate relation or nexus to [the Thomas] case." The sheriff considered the material contraband that should be destroyed; under current criteria, he could not "even submit it to the state lab" for analysis. The Commonwealth's Attorney did not object to the sheriff's recommendation, and the material was "just put . . . down the commode."

Testifying at the hearing on his motion to dismiss, Thomas said that Jessica gave him the marijuana the day before the murders occurred and that he took it home and put it in his closet. The next night, he smoked some of the marijuana while Lanie Creech was with him "on the way to the Wiseman's." Ms. Marshall, Thomas's aunt, testified, however, that she talked with Thomas after she found the marijuana. He told her that the marijuana she found had been brought from the Wiseman house after the murders and that the marijuana he smoked on the way to the Wiseman's came from a different source.

We think, as the trial judge held, that *Arizona* v. *Youngblood*, 488 U.S. 51 (1988), is dispositive of the issues raised by Thomas's motion to dismiss. There, in a prosecution for child molestation, sexual assault, and kidnapping, the police negligently failed to preserve evidence consisting of semen samples from the victim's body and clothing, making it impossible for the defense to have tests performed on the evidence. The defendant was convicted in the trial court, despite his claim that the failure to refrigerate the evidentiary material denied him the right to exonerate himself. The Supreme Court of Arizona reversed the conviction. The Supreme

---

[8] A few days after the "baggie" was delivered to Ms. Alexander, she was appointed co-counsel for Thomas.

Court of the United States reversed the holding of the Arizona court.

Distinguishing the situation where evidence is lost or destroyed from the circumstance where evidence is concealed, the Supreme Court held that, ''unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.'' *Id.* at 58. Continuing, the Court stated:

> The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.

*Id.* at 57. Here, the trial court found there was ''nothing corrupt or in bad faith'' in the destruction of the marijuana, and the evidence supports that finding. Thomas does not question the finding; indeed, he told the trial court during argument on the motion to dismiss that he was ''not alleging bad faith'' in the destruction of the marijuana.

Furthermore, this is clearly a case of failure to preserve evidentiary material, rather than one of concealment. When Ms. Alexander became Thomas's co-counsel, she already had knowledge of the circumstances surrounding the discovery of the marijuana, and she told Benton Pollok, Thomas's co-counsel, about the discovery of the drug.

More important, with the possible exception of Jessica Wiseman, Thomas himself knew more than anyone else about the role the marijuana played in the murder scenario, and he also knew early on that Mrs. Marshall had discovered the marijuana in his closet. While Attorneys Horne and West, later appointed to represent Thomas, may not have learned about the marijuana until the trial date approached, Thomas is as much to blame for their ignorance as anyone connected with the case. Under these circumstances, it would be unrealistic to say that the Commonwealth concealed or withheld evidence from Thomas and, hence, was guilty of violating the principles enunciated in *Brady. See United States* v. *Valera*, 845

F.2d 923, 927-28 (11th Cir. 1988), *cert.denied*, 490 U.S. 1046 (1989).

Furthermore, we do not think that Thomas has established any prejudice resulting from the destruction of the marijuana. As noted at the outset of this discussion, Thomas claims that the destruction deprived him of evidence he could have used in defense of the charges against him and in mitigation of punishment. He further argues this deprivation interfered with his right to the effective assistance of counsel and denied him a fair trial.

Like that of the defendant in *Youngblood*, Thomas's argument assumes that had the marijuana not been destroyed, tests would have revealed it was laced with PCP and that he then could have shown his "mental state at the time of the crime" was affected by ingestion of the drug. But no claim was made during the trial, either in the guilt phase or the sentencing phase, that the marijuana Thomas smoked was laced with PCP or, more significant, that his conduct was affected in any manner by whatever substance he smoked.

Nor do we think Thomas established that, had the marijuana been subjected to tests, the results "might have exonerated [him]." *Youngblood*, 488 U.S. at 57. Even if tests had shown that the marijuana was laced with PCP and that the PCP affected Thomas's mental state at the time of the crime, the only possible materiality of such a showing would have concerned Thomas's ability to form the intent to kill and to premeditate. But the evidence was uncontradicted that the intent to kill and the premeditation incident to the Wiseman murders had existed for several days before Thomas ever smoked the marijuana he now claims might have been laced with PCP. Hence, there was not "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). We conclude, therefore, that the trial court did not err in denying Thomas's motion to dismiss.

## GUILT PHASE

### Jury Selection

Thomas contends that the trial court erred in failing to disqualify six persons who served as jurors in this case. He argues that, because the six admitted they were friends or business associates of the Commonwealth's Attorney, they were disqualified from jury service.

Thomas acknowledges that in *Calhoun* v. *Commonwealth*, 226 Va. 256, 307 S.E.2d 896 (1983), we said former clients of the prosecutor were not disqualified from jury service, that in *Elam* v. *Commonwealth*, 229 Va. 113, 326 S.E.2d 685 (1985), we held a sister of a former prosecutor and four former clients of the then present prosecutor not disqualified, and that in *Wise* v. *Commonwealth*, 230 Va. 322, 337 S.E.2d 715 (1985), *cert. denied*, 475 U.S. 1112 (1986), we ruled a long-time friend and golfing buddy of the prosecutor not disqualified. Thomas maintains, however, that his case is distinguishable because the relationships involved are current and the fact there were as many as six jurors associated with the prosecutor "increases the likelihood of prejudice or bias, whether conscious or subconscious."

On voir dire, prospective juror Gregory Felton said he and the Commonwealth's Attorney knew each other. Gloria Farrar stated she knew of the prosecutor. Vivian Milby told the court the prosecutor was a friend. Lee Roberts said he knew the prosecutor. William Lee advised the court he was a cabinetmaker and had done work for the Commonwealth's Attorney. Garland Harrow said he and the prosecutor grew up together.

None of these jurors indicated a present relationship with the Commonwealth's Attorney so close as to require a per se finding of disqualification, either singly or in combination. Each person clearly disavowed any sense of bias or prejudice, and there is nothing in the voir dire responses from which an inference of "subconscious" bias can be drawn. Accordingly, we hold that the trial court did not err in seating the six jurors.

### Admissibility of Photographs

Thomas contends the trial court erred in admitting photographs of the crime scene showing damage to the bodies of the murder victims. Thomas says the damage portrayed "was extreme and gruesome and only served to arouse the jurors' passion against [him]."

The trial court admitted a portion of the photographs offered by the Commonwealth and rejected others, indicating that those admitted were sufficient to show the condition of the bodies of the victims. Rejecting the remaining photographs, the trial judge stated: "We have to balance demonstrative evidence between that which is inflamm[atory]and that which is helpful to the jury, and I think we have reached that stage."

■ In striking this balance, the trial court demonstrated a careful exercise of the discretion with which it was vested in determining what was admissible and what was not. In *Clozza* v. *Commonwealth*, 228 Va. 124, 135, 321 S.E.2d 273, 280 (1984), *cert. denied*, 469 U.S. 1230 (1985), we approved the trial court's exercise of discretion in admitting photographs which " 'portrayed more graphically, but not more inflammatorily, than the testimony of [the witnesses] the methodical manner in which the killing . . . was accomplished.' " (Quoting *Waye* v. *Commonwealth*, 219 Va. 683, 692, 251 S.E.2d 202, 208, *cert. denied*, 442 U.S. 924 (1979)). The photographs in question here portrayed similar methodical action on Thomas's part. It was not error, therefore, to admit the photographs.

## PENALTY PHASE

### *Judge or Jury Sentencing*

In *Ballard* v. *Commonwealth*, 228 Va. 213, 321 S.E.2d 284 (1984), *cert. denied*, 470 U.S. 1085 (1985), this Court decided that a juvenile who is transferred to circuit court and prosecuted for capital murder, but convicted by a jury of first degree murder, was properly sentenced by the judge rather than the jury. We specifically reserved decision on the question presented here, *viz.*, whether a juvenile who is convicted by a jury of capital murder should be sentenced by the judge in accordance with Code § 16.1-272, part of the juvenile law, or by the jury pursuant to §§ 19.2-264.3 and -264.4, two of the death penalty statutes. *Ballard*, 228 Va. at 215 n. 3, 321 S.E.2d at 285 n. 3.

In pertinent part, Code § 16.1-272 provides as follows:

A. In the hearing and disposition of felony cases properly before a circuit court having criminal jurisdiction of such offenses if committed by an adult, the court, after giving the juvenile the right to a trial by jury on the issue of guilt or innocence and upon a finding of guilty, may sentence or commit the juvenile offender in accordance with the criminal laws of this Commonwealth or may in its discretion deal with the juvenile in the manner prescribed in this law for the hearing and disposition of cases in the juvenile court.

Code § 19.2-264.3 provides in pertinent part as follows:

A. In any case in which the offense may be punishable by death which is tried before a jury the court shall first submit to the jury the issue of guilt or innocence of the defendant of the offense charged in the indictment . . . .

. . . .

C. If the jury finds the defendant guilty of an offense which may be punishable by death, then a separate proceeding before the same jury shall be held as soon as is practicable on the issue of the penalty, which shall be fixed as is provided in § 19.2-264.4.

As pertinent here, Code § 19.2-264.4 reads as follows:

A. Upon a finding that the defendant is guilty of an offense which may be punishable by death, a proceeding shall be held which shall be limited to a determination as to whether the defendant shall be sentenced to death or life imprisonment. In case of trial by jury, where a sentence of death is not recommended, the defendant shall be sentenced to imprisonment for life.

Thomas contends he should have been sentenced by the judge, rather than the jury. He recognizes that jury sentencing is the general rule in Virginia and that, in capital cases, Code §§ 19.2-264.3 and -264.4 provide for jury sentencing in a separate penalty trial. He argues, however, that Code § 16.1-272 provides a specific exception to the general rule of jury sentencing. This exception, he says, accords with the state's policy in dealing with juveniles in criminal cases — rehabilitation, not retribution, is the goal.

We disagree with Thomas's interpretation of the cited statutes. Code § 19.2-264.3(A) and (C) provide that, in *any* case tried by a jury in which the offense may be punishable by death, the jury shall fix the penalty. Read alone, this language permits no exceptions, even where the accused is a juvenile who has been certified for trial on a capital case as an adult.

But if, when Code § 16.1-272 is read along with §§ 19.2-264.3 and -264.4, a conflict may appear, an ordinary rule of statutory construction serves to resolve the conflict. The rule is that "when one statute speaks to a subject in a general way and another deals

with a part of the same subject in a more specific manner, the two should be harmonized, if possible, and where they conflict, the latter prevails." *Va. National Bank* v. *Harris*, 220 Va. 336, 340, 257 S.E.2d 867, 870 (1979). *See also Hudler* v. *Cole*, 236 Va. 389, 393, 374 S.E.2d 39, 42 (1988).

■ Sections 16.1-272, 19.2-264.3, and 19.2-264.4 all deal with the subject of punishment of criminal offenders. Section 16.1-272 speaks to the subject in a general way, referring to the broad class of "felony cases" and prescribing no set penalty, while §§ 19.2-264.3 and -264.4 speak to the subject in a specific way, confining their range to the narrow class of capital cases and prescribing definite penalties. We think a conflict does exist between § 16.1-272, on the one hand, and §§ 19.2-264.3 and -264.4, on the other, so far as the punishment of juveniles certified for trial on capital cases is concerned, and, therefore, that the latter statutes prevail.

### *Lack of Remorse*

The Commonwealth called Thomas's uncle, Herbert Marshall, as a witness in the penalty phase. Marshall testified that he was at work about 4:00 a.m. on November 10, the date of the Wiseman murders, when Mrs. Marshall called to tell him about the killings. He arrived home between 7:00 and 7:30 a.m. and found Thomas and Jessica asleep "close together" on the sofa. Defense counsel objected on relevance grounds, and the Commonwealth's Attorney stated that the fact "these two . . . right after the murder . . . were there just lying on the sofa asleep" was evidence of Thomas's lack of remorse sufficient to support a finding of "future dangerousness or vileness." Defense counsel moved for a mistrial. The trial court denied the motion.

■ Thomas argues that the prosecutor's remark about lack of remorse "had no relevance . . . and only served to further inflame and prejudice the jury." We disagree with Thomas. In *Clark* v. *Commonwealth*, 220 Va. 201, 257 S.E.2d 784 (1979), *cert. denied*, 444 U.S. 1049 (1980), we said that it is "obviously proper" for a jury in a capital case to consider testimony of the defendant's lack of "regret or remorse" in determining "dangerousness," *viz.*, whether the defendant "would in all probability commit criminal acts of violence in the future." *Id.* at 210, 257 S.E.2d at 790. We

have also recognized that such testimony may be considered in determining "vileness." *Bunch* v. *Commonwealth*, 225 Va. 423, 443, 304 S.E.2d 271, 282, *cert. denied*, 464 U.S. 977 (1983).[9]

## *Vileness*

As noted previously, the jury based its sentence of death upon the aggravating factor of "vileness," *viz.*, Thomas's conduct in committing the offense was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim." Code § 19.2-264.2. Thomas argues that the evidence was insufficient to establish vileness. We disagree. We think the evidence clearly shows that Mrs. Wiseman's murder involved both aggravated battery and depravity of mind.

We have defined the term "aggravated battery" to mean "a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder." *Smith* v. *Commonwealth*, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), *cert. denied*, 441 U.S. 967 (1979). While a single gunshot wound, causing instantaneous death, does not constitute an aggravated battery, *Peterson* v. *Commonwealth*, 225 Va. 289, 296, 302 S.E.2d 520, 525, *cert. denied*, 464 U.S. 865 (1983), "multiple gunshot wounds may constitute an 'aggravated battery'. . . where there is an appreciable lapse of time between the first shot and the last, and where death does not result instantaneously from the first." *Barnes* v. *Commonwealth*, 234 Va. 130, 139-40, 360 S.E.2d 196, 203 (1987), *cert. denied*, 484 U.S. 1036 (1988).

Although Thomas stated in his confession that he shot at the Wisemans from the doorway of their bedroom and "couldn't see them," medical evidence shows that both victims were shot in the face from close range and that both shots would have been fatal. Mrs. Wiseman, however, was able to get out of her bed and walk to Jessica's bedroom, where she was again struck in the face by a blast from Thomas's shotgun, this one killing her instantaneously. Hence, it is clear beyond any doubt that there was "an appreciable lapse of time between the first shot [that struck Mrs. Wiseman] and the last [and that death did] not result instantaneously from the first." *Id.* It

---

[9] Thomas also argues that the prosecutor's remark constituted an impermissible comment on Thomas's failure to testify. However, this point was not raised in the trial court, and, accordingly, we will not consider it now. Rule 5:25.

is just as clear that the battery to Mrs. Wiseman was "more culpable than the minimum necessary to accomplish [her murder]," *Smith*, 219 Va. at 478, 248 S.E.2d at 149, and, therefore, that the battery was aggravated.

██ We have defined depravity of mind as "a degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation."[10] *Id.* Only a person of depraved mind could plan and commit the execution-style killings this record reveals yet show no remorse or regret for his actions.

### SENTENCE REVIEW

#### *Passion and Prejudice*

Code § 17-110.1(C)(1) requires this Court to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor." Thomas contends that his death sentence was imposed under the influence of these factors. His entire argument on the subject is as follows:

The crime was certainly the most notorious event that had transpired in Middlesex County in recent memory. The coverage the event received by a frantic press could only have contributed to a lynch-mob mentality and vigilante sense of justice that was impossible to cure with anything other than a change of venue.

██ Earlier in this opinion, we held that the trial court did not err in denying Thomas's motion for a change of venue. Implicit in this

---

[10] Evidence of extraordinary planning and premeditation on Thomas's part is provided in the record. Early in the week during which the murders occurred, Mr. and Mrs. Marshall, with whom Thomas lived, were in Roanoke on a hunting trip and staying at the home of a cousin. Thomas knew where the Marshalls would be staying. One morning, when Marshall got into his pickup truck to go hunting, he "didn't have any brakes" and discovered that the brake line had been "cut . . . to the point that all of the brake fluid in one half of the master cylinder was drained." On Thursday afternoon of the same week, Lanie Creech asked Thomas when the Marshalls would be returning, and he said "they wouldn't get back until . . . some time later because they had truck problems." When the Marshalls returned on Thursday evening, Thomas expressed surprise. He told Lanie he "hoped he [wouldn't] get in trouble for going up to Roanoke [with Jessica and] cutting the brake line." From this evidence, the jury was entitled to infer that Thomas cut the brake line in order to delay the Marshalls' return until after he had carried out the plan to murder Jessica's parents.

holding is the determination that Thomas failed to establish the existence of "a lynch-mob mentality and vigilante sense of justice" in Middlesex County. Therefore, his entire argument on this subject collapses of its own weight. Be that as it may, our independent examination of the record reveals nothing to indicate that the sentence of death was the product of passion, prejudice, or other arbitrary factor.

### Excessiveness and Disproportionality

Code § 17-110.1(C)(2) requires this Court to consider and determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Thomas's entire argument on this subject involves a comparison of his punishment with Jessica's, which consisted of her commitment to the custody of the Department of Youth and Family Services until she reaches her twenty-first birthday. *See* Code § 16.1-285.

In determining excessiveness and disproportionality, we have consistently rejected efforts by defendants to compare their sentences with those received by confederates. *King* v. *Commonwealth*, 243 Va. 353, 371, 416 S.E.2d 669, 679 (1992); *Evans* v. *Commonwealth*, 222 Va. 766, 780, 284 S.E.2d 816, 823 (1981), *cert. denied*, 455 U.S. 1038 (1982), *aff'd on remand*, 228 Va. 468, 323 S.E.2d 114 (1984), *cert. denied*, 471 U.S. 1025 (1985); *Stamper* v. *Commonwealth*, 220 Va. 260, 283-84, 257 S.E.2d 808, 824 (1979), *cert. denied*, 445 U.S. 972 (1980); *Coppola*, 220 Va. at 258-59, 257 S.E.2d at 807-08; *Clark*, 220 Va. at 220-21, 257 S.E.2d at 796-97. We reject Thomas's effort to make a similar comparison here.

The true test in determining excessiveness or disproportionality is whether "juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes." *Stamper*, 220 Va. at 284, 257 S.E.2d at 824. Applying this test, we have examined the records of all capital murder cases previously reviewed by this Court where, as here, the death sentence was based upon the "vileness" predicate alone. *Buchanan* v. *Commonwealth*, 238 Va. 389, 384 S.E.2d 757 (1989), *cert. denied*, 493 U.S. 1063 (1990); *Bennett* v. *Commonwealth*, 236 Va. 448, 374 S.E.2d 303 (1988), *cert. denied*, 490 U.S. 1028 (1989); *Barnes* v. *Commonwealth*, 234 Va. 130, 360 S.E.2d 196 (1987), *cert. denied*, 484 U.S. 1036 (1988); *Payne*

v. *Commonwealth*, 233 Va. 460, 357 S.E.2d 500, *cert. denied*, 484 U.S. 933 (1987); *Correll* v. *Commonwealth*, 232 Va. 454, 352 S.E.2d 352, *cert. denied*, 482 U.S. 931 (1987); *Wise* v. *Commonwealth*, 230 Va. 322, 337 S.E.2d 715 (1985), *cert. denied*, 475 U.S. 1112 (1986); *Boggs* v. *Commonwealth*, 229 Va. 501, 331 S.E.2d 407 (1985), *cert. denied*, 475 U.S. 1031 (1986); *Washington* v. *Commonwealth*, 228 Va. 535, 323 S.E.2d 577 (1984), *cert. denied*, 471 U.S. 1111 (1985); *Jones* v. *Commonwealth*, 228 Va. 427, 323 S.E.2d 554 (1984), *cert. denied*, 472 U.S. 1012 (1985). Cases reviewed prior to 1984 are listed in *Jones*, 228 Va. at 450 n. 3, 323 S.E.2d at 567 n. 3.

Our examination of these decisions, as well as capital cases resulting in life imprisonment, leads us to the conclusion that Thomas's sentence of death is not excessive or disproportionate when compared to sentences generally imposed by sentencing bodies in this jurisdiction for crimes of a similar nature. Mrs. Wiseman's murder at least equals in vileness a number of the killings involved in the decisions listed above.

Finding no error in any of the issues raised by Thomas and perceiving no reason to disturb the death sentence, we will affirm the judgment of the trial court.

*Affirmed.*