# Mickey Wayne Davidson

## v.

# Commonwealth of Virginia

Record No. 911294

June 5, 1992

Present: All the Justices

*Charles F. Lincoln (Robert W. Detrick, on brief), for appellant.*
*Oliver L. Norrell, III, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.*

JUSTICE HASSELL delivered the opinion of the Court.

As required by Code § 17-110.1, we review the sentence of death imposed upon Mickey Wayne Davidson.

## I. Proceedings.

A grand jury issued three indictments against Mickey Wayne Davidson, charging him with capital murder for the multiple slayings of Doris Jane Davidson, Tammy Lynn Clatterbuck, and Mamie Darnell Clatterbuck. Code § 18.2-31(7). Davidson was evaluated by a psychologist and was deemed competent to ''stand trial [and] make rational decisions regarding trial strategy.''

At the first stage of a bifurcated trial, conducted pursuant to Code §§ 19.2-264.3 and -264.4, Davidson pled guilty to each of the capital murder charges. Before accepting the pleas of guilty, the trial court considered evidence which included testimony of witnesses and numerous exhibits. Also, the trial court examined Davidson and found that the guilty pleas were made knowingly, voluntarily, and intelligently. After hearing the evidence and argument of counsel, the court accepted the guilty pleas and found Davidson guilty of the capital murder offenses. The court ordered a pre-sentence investigation report from the probation office and scheduled a proceeding on the penalty phase.

At the beginning of the penalty phase, counsel for Davidson informed the court that Davidson had directed them not to present any evidence on his behalf. Davidson then testified, under oath, that: he had been advised by his counsel of the nature of the charges and the elements that had to be proven against him before entering the pleas of guilty; he had been informed that he has a right to an evaluation of his mental competency for purposes of the guilt and penalty phases of the proceedings, but he elected not to participate in such evaluation; he had been informed by counsel of the sentences that may be imposed upon him during the penalty phase; and he had directed his attorneys not to present any evidence on his behalf at the penalty phase.

The Commonwealth presented evidence during the penalty phase. After considering the evidence and the probation officer's report, the court found that Davidson's ''conduct in the commission of the offenses was outrageous, wantonly vile, was horrible, and inhuman, in that it involved a depravity of mind and aggravated battery to the victims.'' By order dated July 11, 1991, the court fixed Davidson's punishment at death.

Davidson's lawyers filed a timely notice of appeal in this Court. Later, however, Davidson filed a motion requesting permission to waive his appeal of right to this Court. We entered an order which required that the circuit court conduct an evidentiary hearing to determine if Davidson's decision to waive his appeal was knowingly, voluntarily, and intelligently made. The trial court conducted an evidentiary hearing and, after an extensive examination of Davidson, found that his decision to waive his appeal was made knowingly, voluntarily, and intelligently.

■ Although Davidson waived his appeal of right, this Court must review the imposition of the death sentence. Code § 17-110.1 states, in relevant part:

A. A sentence of death, upon the judgment thereon becoming final in the circuit court, shall be reviewed on the record by the Supreme Court.

. . . .

C. [T]he court shall consider and determine:

1. Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and

2. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

We ordered that Davidson's counsel file a brief and present oral argument to this Court upon the matters contained in Code § 17-110.1. Thus, we review the sentence of death imposed upon Davidson to determine whether his sentence was imposed under the influence of any arbitrary factor or whether his sentence is excessive or disproportionate.

## II. Evidence

In accordance with well-established principles of appellate review, we will review the evidence in the light most favorable to the Commonwealth. Davidson lived in the Town of Saltville, Smyth County, with his wife, Doris Jane Davidson, and his stepdaughters, Mamie Darnell Clatterbuck, 14 years old, and Tammy Lynn Clatterbuck, 13 years old.

On the morning of June 14, 1990, Davidson went to see his brother-in-law, Dennis Darrell McBride. He arrived at McBride's home between 7:00 and 8:00 a.m. Davidson told McBride, "I've got bad troubles" and that he (Davidson) had "killed all three of them." Davidson suggested digging a grave on a hill behind McBride's house and sought McBride's help in burying the bodies. McBride refused to help Davidson.

Davidson spoke clearly and deliberately when explaining to McBride what had happened. Davidson had a faint smell of alcohol on his breath, but he was not "drunk."

McBride reported this information to Walter Scott Sexton, Chief of Police of the Town of Chilhowie. Sexton conveyed the information to the appropriate police officials in Smyth County. Chief Deputy Kenneth M. Lewis of the Smyth County Sheriff's Office, along with other officers, went to the Davidson residence. They knocked on the door, but no one responded. The police began to search for Davidson.

A police deputy found Davidson and advised him of his *Miranda* rights. Davidson agreed to go to the police station, where he wrote and signed the following statement:

The County took Doris' children's father to court for child support. When they got in court Doris, my wife, decided to go back to Front Royal and live with the children's father. He was supposed to come and get them yesterday. I just couldn't stand to see her go back. I just couldn't stand to see them go back. So about 10:00 or 11:00 A.M. yesterday, 6/13/90, I just took a crowbar and killed them, Doris and the two kids. After I killed them I put a blanket or two over Tammy and a trash bag over Mamie's head. I put a box spring over Doris. The crowbar is in the kitchen. After that I left. It wasn't too long after I did it.

Davidson also told Ronald B. Roland, a Smyth County deputy sheriff: "I killed them all three. I killed all three of them there in the house, locked up with the couch against the front door."

Davidson gave the police officers permission to search his house. When the police officers searched the home, they found Mrs. Davidson's body lying face down in a pool of blood in the living room. They also found Mamie's body partially covered with a trash bag, and Tammy's body covered with blankets. Blood was splattered upon the walls and floors. All the victims had been brutally beaten to death with a crowbar, which was found in the Davidson residence.

William Massello, M.D., Chief Medical Examiner for the western region of Virginia, performed autopsies on the bodies. The autopsy of Doris Davidson revealed numerous breaks in the skin and lacerations on the left side of her head and face. These lacerations were "skull fractures and a great many bruises or contusions of the brain."

Mamie Clatterbuck had multiple severe injuries to her head and face. Of the three victims, her injuries were the most extensive. In describing her injuries, Dr. Massello stated:

[T]here were also some rather strange square pattern type areas on the right cheek and on the left side of the forehead. What these are is areas where the skin is crushed and in being crushed it takes on a similar configuration to the instrument that is actually impacting it. For example, if you took a hammer which is round on the end and hit someone and crushed the skin, in a very perfect manner it would leave a nice round mark where this instrument impacted and that is the case here. We have a square imprint which indicates that there was somewhat of a square configuration to a portion of the instrument used.

Tammy Clatterbuck suffered an impact "right between the eyebrows . . . with extensive bruising. . . ." This blow crushed her facial bones and fractured her nose. She had received one or more blows to an area near her mouth. There was a tearing of the inside of her lip as a result of a blow being inflicted. She had injuries to the front of the chest which bruised her heart and lungs. These injuries were lethal.

### III. Propriety of the Death Penalty

■ Code § 19.2-264.2 provides, in pertinent part:

In assessing the penalty of any person convicted of an offense for which the death penalty may be imposed, a sentence of death shall not be imposed unless the court . . . shall (1) after consideration of the past criminal record of convictions of the defendant, find . . . that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim; and (2) recommend that the penalty of death be imposed.

The trial court found that Davidson's conduct in committing the crimes was "outrageous, wantonly vile, was horrible and inhuman in that it involved the depravity of mind and aggravated battery to

the victims.'' Counsel for Davidson argues that the trial court's findings were erroneous.

In *Smith* v. *Commonwealth*, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), *cert. denied*, 441 U.S. 967 (1979), we stated:

> [W]e construe the words 'depravity of mind' as used here to mean a degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation. Contextually, we construe the words 'aggravated battery' to mean a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder. [Citation omitted]. It seems to us that these are the only constructions rationally related to the commonly accepted connotation of the prefatory words, 'outrageously or wantonly vile, horrible or inhuman.'

*Accord, Strickler* v. *Commonwealth*, 241 Va. 482, 496, 404 S.E.2d 227, 237, *cert. denied*, 502 U.S. ___, 112 S.Ct. 386 (1991); *Stockton* v. *Commonwealth*, 241 Va. 192, 213, 402 S.E.2d 196, 208, *cert. denied*, 502 U.S. ___, 112 S.Ct. 280 (1991); *Quisenberry* v. *Commonwealth*, 241 Va. 364, 381, 402 S.E.2d 218, 228, *cert. denied*, 502 U.S. ___, 112 S.Ct. 113 (1991); *Spencer* v. *Commonwealth*, 238 Va. 563, 576, 385 S.E.2d 850, 857-58 (1989), *cert. denied*, 493 U.S. 1093 (1990); *Hoke* v. *Commonwealth*, 237 Va. 303, 316, 377 S.E.2d 595, 603, *cert. denied*, 491 U.S. 910 (1989).

The evidence was more than sufficient to support the trial court's finding of an aggravated battery within the definition from *Smith* quoted above. The autopsies revealed that each victim suffered multiple fractures and penetrations of the skull as a result of having been hit repeatedly with a crowbar. There were more blows than necessary to kill each victim. Additionally, Dr. Massello testified that the deaths did not occur instantaneously, and each victim suffered a great deal of pain in the interval before death:

> [W]e have many injuries here. So there was a period of time over which the injuries were inflicted. You can't inflict multiple injuries quickly. It takes seconds or minutes or whatever. Second of all, brain injuries do not necessarily kill one instantaneously. There is normally an interval of survival for a few minutes or perhaps several minutes or perhaps even an hour or

two. . . . Blows to the head and blows to the body in general are painful and [the victims] would have sensed pain.

Mamie Clatterbuck suffered fractures of her skull which were so severe and so extensive that her skull was "almost pulverized." Additionally, Davidson's methodical use of a crowbar to beat his victims to death in such a savage and brutal fashion exemplifies his depravity of mind.

## IV. Passion, Prejudice and Proportionality

As we have repeatedly stated, the test of proportionality is whether "juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes." *Smith* v. *Commonwealth*, 239 Va. 243, 271, 389 S.E.2d 871, 886, *cert. denied*, 498 U.S. 881 (1990) (*quoting Stamper* v. *Commonwealth*, 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979), *cert. denied*, 445 U.S. 972 (1980)).

We have examined the records in all capital murder cases reviewed by this Court since the adoption of Code § 17-110.1. Applying the test of proportionality, we hold that the sentence of death imposed upon Davidson is neither excessive nor disproportionate to the penalties imposed in similar cases.

In *Buchanan* v. *Commonwealth*, 238 Va. 389, 384 S.E.2d 757 (1989), *cert. denied*, 493 U.S. 1063 (1990), we affirmed the capital murder conviction of Douglas Buchanan who was convicted of capital murder in violation of former Code § 18.2-31(g), now Code § 18.2-31(7), for the multiple slayings of his father, two half-brothers, and stepmother. The multiple slayings in this case, just as in *Buchanan*, involved family members. However, the method and manner of the slayings in this case, as depicted by the photographs of the victims' bodies and a videotape of the crime scene, are at least as atrocious as the slayings in *Buchanan*.

Davidson's counsel argues that the sentence of death was imposed under the influence of passion or prejudice. Counsel contends that the trial judge was not objective because he made the following statements during the penalty phase which Davidson's counsel quotes, out of context, in his brief:

I can't approach it coldly and detached. . . . Mr. Davidson, it seems trite, but the willful and malicious premeditated killing

of another human is obviously the most heinous of crimes known to our society. It is particularly aggravating and outrageous when, as here, there are multiple victims.

We disagree with counsel's contention.

■ A careful and objective review of the transcript indicates that the trial court exhibited a great degree of compassion and concern for Davidson. The trial court stated:

> This [the sentencing phase of the proceeding] is not something the Court takes lightly. It is not a matter that the Court is used to . . . . I assure you again, as the Commonwealth has noted, that I can't approach it coldly and detached. I have a human concern that does weigh heavily in this. More has gone into [the capital murder proceedings] than just the two proceedings that we've had here. To the two hearings, the one on the guilt phase and the one on this penalty phase, I bring to you a lot of human compassion. I bring [to you, Mr. Davidson,] a considerable amount of research and soul searching. I bring a lot of judicial experience in having tried hundreds of defendants and sentenced them for all kinds of crimes. I bring a true appreciation for the awesome responsibility I face . . . . You have, in fact, in my estimation demonstrated at all stages complete resolve to get these proceedings brought to a swift conclusion and yourself to justice. I believe throughout, likewise, you have at all stages demonstrated in my estimation complete competency and intelligence and understanding of what was going on. Mr. Davidson, it seems trite, but the willful and malicious premeditated killing of another human is obviously the most heinous of crimes known to our society. It is particularly aggravating and outrageous when, as here, there are multiple victims. Our Commonwealth has seen fit in a proper case in such cases to provide for the imposition of the supreme penalty. Mr. Davidson, it is my considered opinion that this is a proper case for the imposition of the supreme penalty.

■ The trial court's statements, read in the proper context, are illustrative of the compassion and concern that the court exhibited to Davidson. The record is devoid of any evidence which would suggest otherwise. Thus, we hold that the sentence of death was not

imposed under the influence of passion, prejudice, or any other arbitrary factor.

## V. Conclusion

Having reviewed the sentence of death pursuant to Code § 17.1-110.1, we decline to commute the sentence to imprisonment for life. Accordingly, we will affirm the judgment of the trial court.

*Affirmed.*