# KENNETH MANUEL STEWART, JR.

## v.

# COMMONWEALTH OF VIRGINIA

Record Nos. 921500 and 921501

February 26, 1993

Present: All the Justices

*Steven R. Grant; Webster Hogeland* for appellant.
*Robert Q. Harris, Assistant Attorney General (Mary Sue Terry, Attorney General,* on brief), for appellee.

JUSTICE WHITING delivered the opinion of the Court.

In the first phase of a bifurcated trial conducted pursuant to the provisions of Code §§ 19.2-264.3 and -264.4, a jury convicted Kenneth Manuel Stewart, Jr., of the first degree murder of his wife, Cynthia Jeanne Stewart, and the use of a firearm in the commission of that murder. The jury also convicted Stewart of the capital murder of his five-month-old son, Jonathan Edward Stewart, as a part of the same act or transaction as the killing of Cynthia Stewart, Code § 18.2-31(7), and the use of a firearm in the commission of Jonathan's murder. The jury fixed the punishments for the noncapital offenses at life imprisonment for the murder of Cynthia Stewart and two and four years imprisonment, respectively, for the use of a firearm in the two murders.

In the second phase of the trial, the jury fixed Stewart's punishment at death for the capital murder of Jonathan, based on both the "vileness" and "future dangerousness" predicates of the capital murder statute. Code § 19.2-264.4. After considering a postsentence report prepared by a probation officer under the provisions of Code § 19.2-264.5, the trial court imposed the sentences fixed by the jury.

We have consolidated our automatic review of Stewart's death sentence with his appeal of his capital murder conviction, Code § 17-110.1, and certified from the Court of Appeals Stewart's convictions of the remaining offenses. Code § 17-116.06. Also, we have given these matters priority on our docket. Code § 17-110.2.

## I. FACTS

Because the Commonwealth prevailed in the trial court, we state the facts and all inferences that can reasonably be drawn from those facts in the light most favorable to the Commonwealth.

For some time prior to the December 10, 1990 birth of their child, Jonathan, Stewart and his wife had been living in a house owned by her parents in Bedford County. Stewart lost his job the following February, and the couple separated in early April 1991. Mrs. Stewart and Jonathan remained in the house, and Stewart moved to a trailer occupied by his friend Paul Brooks.

Stewart was not permitted to take Jonathan from the house, and could only visit him while Mrs. Stewart was at home. When Stewart returned from those visits, he expressed anger to Brooks because of the alleged interference of his wife's parents in his affairs and because of the restrictions placed upon his visitations with Jonathan. On one of these occasions, Stewart made a remark to Brooks to the effect that "I just ought to go ahead and kill it and get it over with, just solve this problem."

On Sunday afternoon, May 12, 1991, armed with a .25-caliber semi-automatic pistol concealed in his boot, Stewart went to visit Jonathan. During this visitation with Jonathan, Stewart claimed that he unsuccessfully attempted to persuade Mrs. Stewart to reconcile with him.

After Mrs. Stewart's alleged rejection of his pleas, Stewart shot her twice. Although Stewart remembered shooting Mrs. Stewart, initially he claimed that he remembered nothing after that shooting until he found himself driving on a New York freeway. Accordingly, the sequence of events at the scene can be reconstructed only from the following inferences that could reasonably be drawn from the physical evidence at the scene, and from the testimony of expert witnesses who interpreted the physical evidence and photographs of such evidence.

Stewart shot Mrs. Stewart in an upstairs bedroom. He fired the first shot into Mrs. Stewart's head just above the bridge of her nose at a range of six inches or less, as the two stood facing each other. When Mrs. Stewart fell, her forehead came to rest on the surface of a nearby bed, close to its foot. Stewart then fired a second shot about two inches above Mrs. Stewart's front hairline into the frontal area of her skull as she lay on the bed.

Later, Stewart went downstairs, where he killed Jonathan by firing two shots into the side of his head, near his ear. One shot was fired at a range of no more than an inch or two. Stewart then carried Jonathan's body upstairs and placed it in the arms of Mrs. Stewart's body. Some time before, Stewart had moved Mrs. Stewart's body

closer to the head of the bed with some force, causing her blood to spatter on the wall above the headboard.

Stewart then turned off the kitchen stove in which Mrs. Stewart had been cooking a casserole, put the family dogs on the back porch, closed both porch doors so that the dogs could not get out, turned on Mrs. Stewart's telephone answering machine, got her house key, and locked the house. Thereafter, Stewart took his wife's car, rather than his older pickup truck, and drove it to New York State. As Stewart was driving through Bedford County, he threw the gun into undergrowth some distance from the road.

Approximately seven o'clock that same evening, Ruth Schultz, Mrs. Stewart's mother, came to the house from her nearby residence. After noticing blood in Jonathan's play pen, Mrs. Schultz went upstairs, where she found the bodies of her daughter and grandson on the bed.

About 3:00 or 4:00 a.m. on Tuesday morning, Stewart telephoned his friends Carolyn and Paul Brown, who lived in Bedford County, from Cleveland, Ohio, and told them that he had killed his wife and son and planned to "turn himself in" to the police. Shortly after noon on Wednesday, the police in a Cleveland suburb arrested Stewart for public intoxication and disorderly conduct.

At first, Stewart told the police that he lived in Cleveland. However, after receiving information from the National Criminal Information Center that there was "a double homicide warrant [for Stewart's arrest] out of Bedford County, Virginia," the police arrested Stewart on that charge and notified the sheriff's office in Bedford County.

## II. ISSUES PREVIOUSLY DECIDED

■ Among his 44 assignments of error, Stewart raises a number of issues that, in previous decisions, we have resolved adversely to his present contentions. Because Stewart has advanced no persuasive reason to depart from those decisions, we will reaffirm them and reject Stewart's contentions. These issues and the cases resolving them follow.

1. The court should have ordered the Commonwealth to comply with one of Stewart's discovery motions to "identify the evidence, and all of it, upon which it intends to rely in seeking imposition of the death penalty based on one of the 'vileness' factors." Resolved by *Strickler v. Commonwealth*, 241 Va. 482, 490-91, 404 S.E.2d

227, 233, *cert. denied*, 502 U.S. ___, 112 S.Ct. 386 (1991), and *Quesinberry v. Commonwealth*, 241 Va. 364, 371-72, 402 S.E.2d 218, 223, *cert. denied*, 502 U.S. ___, 112 S.Ct. 113 (1991).

2. Stewart should have been allowed additional peremptory strikes in the selection of a jury. Resolved by *Yeatts v. Commonwealth*, 242 Va. 121, 127, 410 S.E.2d 254, 258 (1991), *cert. denied*, ___ U.S. ___, 112 S.Ct. 1500 (1992); *Strickler*, 241 Va. at 489, 404 S.E.2d at 232; and *Spencer v. Commonwealth*, 240 Va. 78, 84, 393 S.E.2d 609, 613, *cert. denied*, 498 U.S. 908, 111 S.Ct. 281 (1990).

3. Stewart should have been allowed a *voir dire* examination of each venireman individually and out of the presence of the other veniremen. Resolved by *Fisher v. Commonwealth*, 236 Va. 403, 410, 374 S.E.2d 46, 50 (1988), *cert. denied*, 490 U.S. 1028 (1989).

4. The trial court should have sustained Stewart's motions to prohibit imposition of the death penalty and to dismiss the capital murder indictment because of the following constitutional infirmities:

a. Both the "vileness" and "future dangerousness" statutory predicates for imposition of the death penalty are impermissibly vague because the jury's discretion is unlimited and unguided. Resolved by *Satcher v. Commonwealth*, 244 Va. 220, 227, 421 S.E.2d 821, 826 (1992), and *Smith v. Commonwealth*, 219 Va. 455, 476-78, 248 S.E.2d 135, 148-49 (1978), *cert. denied*, 441 U.S. 967 (1979).

b. The death penalty is cruel and unusual punishment prohibited by the Eighth Amendment to the United States Constitution. Resolved by *Satcher*, 244 Va. at 228, 421 S.E.2d at 826, and *Smith*, 219 Va. at 476, 248 S.E.2d at 148.

c. The use of prior convictions and prior unadjudicated criminal conduct to establish future dangerousness violates the constitutional provisions against double jeopardy. Resolved by *Watkins v. Commonwealth*, 238 Va. 341, 352, 385 S.E.2d 50, 56 (1989), *cert. denied*, 494 U.S. 1074 (1990).

d. In Virginia, defendants are denied a meaningful appellate review because this Court "has never set aside a death sentence for misapplication of an aggravating factor and has refused to consider challenges to the 'vileness' factor when there was also a finding of future dangerousness." Resolved by *Edmonds v. Commonwealth*, 229 Va. 303, 314-15, 329 S.E.2d 807, 815, *cert. denied*, 474 U.S. 975 (1985), in which we rejected a similar unparticularized claim.

e. A defendant who has been sentenced to death has no meaningful appellate review by imposition of a 50-page limitation upon

his opening brief under Rule 5:26. Resolved by *Satcher*, 244 Va. at 228, 421 S.E.2d at 826.[1]

5. The jury should have been informed of Stewart's ineligibility for parole for 30 years because that information would necessarily affect their view of his future dangerousness. Resolved by *Jenkins v. Commonwealth*, 244 Va. 445, 459-60, 423 S.E.2d 360, 369-70 (1992), and *Watkins*, 238 Va. at 351, 385 S.E.2d at 56.

## III. PRETRIAL MATTERS

### A. *Motion for Discovery*

■ Stewart contends that the Commonwealth should have been required to provide him with a list of its expert witnesses, statements of their qualifications, and a description of their expected testimony and copies of any reports prepared by those experts. An accused has no general constitutional right to such evidence. *O'Dell v. Commonwealth*, 234 Va. 672, 682, 364 S.E.2d 491, 497, *cert. denied*, 488 U.S. 871 (1988); *Watkins v. Commonwealth*, 229 Va. 469, 479, 331 S.E.2d 422, 430-31 (1985), *cert. denied*, 475 U.S. 1099 (1986). Nor do our rules create any such right. *Watkins*, 229 Va. at 479, 331 S.E.2d at 431. Accordingly, the trial court did not err in denying Stewart's discovery motion.

### B. *Motions to Suppress Incriminating Statements*

Stewart argues that the court should have sustained his motions to suppress the following incriminating statements he made to police officers after he was arrested.

1. In his first statement, made to Sergeant C. Raymond Mayhew of the Bedford County Sheriff's Department on the night he was arrested, Stewart admitted shooting his wife and child. He contends that before Mayhew began to tape record his statement, Stewart asked to speak to an attorney after Mayhew informed him of the rights accorded him under *Miranda v. Arizona*, 384 U.S. 436 (1966), yet Mayhew continued to question him. Mayhew denied that

---

[1] Citing no supporting cases, Stewart also contends that no meaningful appellate review is provided because "the trial court does not have to apply any standard to determine whether the jury's recommendation of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the defendant and the crime." However, Code § 17-110.1 requires that this Court, not the trial court, provide such appellate review.

Stewart had requested an attorney, produced Stewart's signed waiver of his *Miranda* rights, and played the tape recording, in which Stewart made no mention of any previous request for an attorney. The trial court has resolved this conflict in the evidence against Stewart. And, we cannot say that the trial court abused its discretion in admitting this statement.

2. Stewart's next two statements were made to George Anderson, a Bedford County jailor, on September 2 and 3, 1991. In one statement, Stewart told Anderson that "it was 'premeditated to kill my wife,' because he couldn't handle her leaving him."

■ Stewart acknowledges that when a suspect initiates a conversation, as he did, it is immaterial that counsel appointed for an accused at his request is not present when he makes his statement. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).[2] However, Stewart contends that "the severe stress and trauma [he] was experiencing," exemplified by his "beg[ging] for the 'electric chair'" in one of the statements and evidenced by the fact that he was being given medication for anxiety, established that "his mental condition had overborne his will and his ability to waive his right to counsel."

■ The question here is not whether there was coercive police activity resulting in statements that were not voluntary. Rather, the issue is whether Stewart made a valid waiver of his *Miranda* rights. And, whether the waiver was valid is a question of fact on which the trial court's finding is entitled to a presumption of correctness on appeal. *Harrison v. Commonwealth*, 244 Va. 576, 581-82, 423 S.E.2d 160, 163 (1992).

■ Anderson testified that Stewart "didn't seem impaired at all" and had no trouble understanding his *Miranda* warnings. Although Anderson also testified that he "might have detected a little anxiety" at the time the statements were made, this is clearly insufficient to overcome the presumption of correctness attached to the trial court's finding that Stewart had waived his *Miranda* rights before he made the statements. *See Harrison*, 244 Va. at 583, 423 S.E.2d at 164 (visible depression alone insufficient to overcome presumption of correctness of trial court's finding of *Miranda* waiver).

---

[2] Although he recognizes the general rule, Stewart contends that because he had an attorney at the time he made his second, third, and fourth statements, the Bedford County police officials should have notified his attorney before taking the statements. However, Stewart cites no authority, and we find none, supporting his position. We conclude that notice to Stewart's attorney was not required under the circumstances.

3. Stewart argues that his final statement, also initiated by him and made to Mayhew on September 4, 1991, was coerced and, therefore, inadmissible because Mayhew made "a promise" to help Stewart "get medication and receive the death sentence." We do not agree. The transcript of this interview demonstrates that Stewart's incriminating statements were made as a part of his unsuccessful efforts to obtain "a promise" by Mayhew that his requests would be honored.

Indeed, the evidence indicates that Stewart's proposed inducement for this "promise" was that he would "give a full . . . account, you know, of step by step about what happened that day" because in the "last few days . . . it's come back to me . . . what took place on that Sunday, Mother's Day when this crime was committed." Mayhew responded only that he "can say something to [the jailor] but to guarantee that it would be done, I cannot" and that "you are charged with capital murder and it can carry the death penalty. So your wishes may be carried out." Whereupon, Stewart terminated the interview with the remark, "Well, I guess at that time then, that's, that's all I have to say about it."

█ Two inferences may fairly be drawn from this exchange. First, that Mayhew did not coerce Stewart into making the incriminating statements which were a part of Stewart's efforts to obtain concessions *before* he gave his alleged "full account." Second, that Stewart had not gotten assurances satisfactory to him and that he terminated the conversation without giving his "full account." We conclude that the trial court did not err in admitting Stewart's several incriminating statements.

## C. *Motion to Exclude Video Cameras*

At the time of the trial, the Circuit Court of Bedford County had been designated as an experimental court for the use of "electronic media" under the provisions of Code § 19.2-266. Before trial, Stewart objected to electronic media coverage of his trial upon the ground that it "presents such probability of prejudice that it inherently lacks due process."

Without pointing to any specific prejudice caused by the use of cameras in his trial, Stewart merely cites *Estes v. Texas*, 381 U.S. 532 (1965), and contends that his constitutional rights were violated. We do not agree.

■ As the Supreme Court said in *Chandler v. Florida*, 449 U.S. 560, 574 (1981), "*Estes* did not announce a constitutional rule that all photographic or broadcast coverage of criminal trials is inherently a denial of due process." Rather, in the absence of a showing that a criminal trial is "compromised by television coverage," its use is not unconstitutional. *Id.* at 581-82.

■ Stewart has not shown that the presence of video cameras influenced the outcome of these cases in any way and, therefore, he does not demonstrate that his due process rights have been violated. Accordingly, the trial court did not abuse its discretion in failing to exclude the use of video cameras from the trial.

## IV. GUILT PHASE

### A. *Jury Selection*

#### 1. *Voir Dire Examination*

Stewart argues that the court erred in refusing to permit him to ask the following two questions of the venire in his attempt to seat a "life qualified" jury:

Would you be of the opinion that death is the appropriate penalty for all persons found guilty of first degree murder when there are aggravating factors proven that Virginia has set out in the definition of capital murder?

[W]ould you be of the opinion that [death is] the appropriate penalty for all persons found guilty of capital murder when the Commonwealth has proved certain aggravating factors to be taken into account at sentencing?

■ The court did not err in excluding these questions because they provided no factual basis upon which a prospective juror could express an opinion. *See Mueller v. Commonwealth*, 244 Va. 386, 400, 422 S.E.2d 380, 389 (1992); *Satcher*, 244 Va. at 233, 421 S.E.2d at 829.

■ Moreover, Stewart's legitimate right to inquire whether the prospective juror could consider a sentence less than death if he should be found guilty of capital murder was preserved in the following two questions which the trial court permitted:

[I]f you find the accused guilty of capital murder, and the Court gave you the option of death or a life sentence . . . could you fairly consider both options, or would you automatically conclude that death was the appropriate sentence?

Would you be of the opinion that death is the appropriate penalty for all persons found guilty of capital murder when the prosecution has proven certain aggravating factors, even when the Judge has instructed you that you still have the option of a life sentence?

## 2. *Exclusion and Retention of Prospective Jurors*

[11] On appeal, we defer to the trial court's decision to exclude or retain prospective jurors because the trial judge has seen and heard each member of the venire, and is in a better position than this Court to decide whether something will prevent or substantially impair a particular person's performance of his or her duties as a juror. *Eaton v. Commonwealth*, 240 Va. 236, 246, 397 S.E.2d 385, 391 (1990), *cert. denied*, 502 U.S. ___, 112 S.Ct. 88 (1991). Accordingly, a trial court's decision on these issues will not be reversed on appeal without a showing of ''manifest error.'' *Id.*

Stewart argues that Vernon Carter should not have been excused for cause merely because he said ''my Bible belief says thou shalt not kill, and I just couldn't give someone the death penalty.'' According to Stewart, Carter later rehabilitated himself by indicating he could follow the court's instructions and that he could consider any penalty provided by law.

 Any question as to the propriety of the trial court's exercise of its discretion to exclude Carter is laid to rest by Carter's final answers which follow.

THE COURT: Having considered the evidence in this case, could you under any circumstances give this man the death sentence?

MR. CARTER: (Witness shakes his head in the negative.) My Bible belief is that thou shalt not kill.

THE COURT: So your answer would be what; you have to tell us.

MR. CARTER: No.

THE COURT: You're saying no. I excuse this witness for cause on my own motion, it's obvious to me that he cannot consider it.

Next, Stewart argues that the court should have excluded Nancy Brown, the wife of a Bedford City policeman, for cause. In support of this argument, Stewart points out Brown's initial statement that in most cases she would believe a police officer's testimony when it conflicted with a non-police officer's testimony. Then Stewart notes the fact that Brown was the wife of ''a police officer in [this] small community.'' Stewart concludes that these two factors meant that Brown was likely ''subjected to a police officer's perspective (her husband's) on the killings which would render her partial and unable to substantially perform a juror's duties.'' We do not agree.

Brown's later *voir dire* examination made it clear that she would not necessarily accept a police officer's testimony that conflicted with other testimony. She said ''you have to weigh both options, observe whatever it is you get from those persons.'' Hence, her willingness to accept a police officer's statement ''in most cases'' did not disqualify her as a juror. *See O'Dell*, 234 Va. at 694, 364 S.E.2d at 503.

Nor did Stewart establish a basis for disqualification merely because of Brown's marriage to a local police officer. Considering Brown's assurances that she could and would decide the case based on the evidence, and considering Stewart's failure to show that Brown had no more information about the case than what she had read in the newspapers some time before the trial, we conclude that Stewart has shown no ''manifest error'' in the court's retention of Brown as a prospective juror.

## B. *Evidentiary Questions*

### 1. *Use of Video Tape of Crime Scene*

Stewart recognizes that we have held that video tapes of a crime scene are admissible in evidence if relevant to show ''motive, intent, method, malice, premeditation and the atrociousness of the crimes,'' even though photographs of the scene have also been admitted. *Spencer v. Commonwealth*, 238 Va. 295, 312, 384 S.E.2d 785, 796 (1989), *cert. denied*, 493 U.S. 1093 (1990). However,

Stewart argues that "in light of emerging technologies and the increasing use of video tape evidence . . . this type of evidence deserves heightened scrutiny."

■ We have viewed the videotape (which was shown to the jury without sound) and the photographs. In our opinion, both are admissible under the *Spencer* standard. Accordingly, the trial court did not abuse its discretion in admitting the videotape of the scene of the crimes.

### 2. *Admission of Paul Brooks' Hearsay Testimony*

Stewart claims that the trial court erred in permitting Paul Brooks to testify, in violation of the hearsay rule, that the Stewarts had consulted an attorney about a divorce or separation. We disagree.

■ Brooks' information came from Stewart's statements to him. Consequently, Stewart's statements to Brooks were "properly received under the party admissions exception to the hearsay rule." *Quintana v. Commonwealth*, 224 Va. 127, 148, 295 S.E.2d 643, 654 (1982), *cert. denied*, 460 U.S. 1029 (1983).

### 3. *Admission of Blood Stain Pattern Analysis*

An investigator from the Bedford County Sheriff's Department first contacted Geoff Brown, a forensic evidence technician employed by the Lynchburg Police Department and an expert in blood stain pattern analysis (blood spatter evidence), on the Sunday evening before the trial was to begin. The investigator sought Brown's help in evaluating the blood stains shown on the photographs of the scene and the bodies of the victims.

Brown came to Bedford County the following day and examined the photographs. That Monday afternoon Brown discussed his conclusions with the Commonwealth's Attorney but submitted nothing in writing.

Tuesday, the first day of trial, was spent in empaneling a jury. Some time Wednesday morning, when opening statements were made and evidence was heard in the first phase of the trial, the Commonwealth's Attorney advised defense counsel that he planned to use Brown as a blood spatter expert to interpret the blood stains shown in the photographs taken of the victims and the scene.

That evening, after telling defense counsel and his investigator substantially what he would say at trial, Brown also offered to furnish them with a list of other blood spatter experts in other police departments. They did not accept Brown's offer at that time.

Later that Wednesday evening, defense counsel talked by telephone with a blood spatter expert in Alabama but not about "anything substantive," because of "a money problem." The following day, Stewart's counsel moved the court for a "recess" and for the "appointment of our own expert to help us intelligently confront this evidence."

The court denied both motions, but upon defense counsel's request that morning, Brown furnished the names and telephone numbers of several police officers in the area who had qualified as blood spatter experts. Defense counsel contacted one of those persons, Larry McGann of the Virginia State Police, that Thursday night, but made no effort to have him come to the trial the next day to assist him in evaluating Brown's testimony, scheduled the following day.

Before Brown testified on Friday, Stewart again unsuccessfully moved for a continuance. Thereafter, Brown testified that a pattern of blood spatter stains on a flat surface can indicate whether the blood had been dropped straight down from a stationary source or had been dropped from a moving source. According to Brown, as blood travels through the air, it travels in a perfect circle and when it hits a surface, it flattens out.

Brown further noted that if blood is dropped from a moving source, that movement will cause the blood to hit the surface at an angle, "giving spur-like or spines off the stains [and] showing the direction in which that blood had been travelling" as it fell to the surface where it was found. On the other hand, if blood is dropped from a stationary source, the spines would go out equally in each direction, causing the blood stain to form "basically [a] perfect round circle."

After examining the photographs of the blood stains on the steps leading to the second floor bedroom where Mrs. Stewart was shot, Brown was of the opinion that the pattern of the stains was consistent with the conclusion that the source of the blood (Jonathan, as shown by other evidence) was carried into the bedroom. Brown also called attention to the similarity of the heavy triangular staining on the bedspread near the foot of the bed and on Mrs. Stewart's forehead when Mrs. Stewart's body was found. Brown concluded

that these similar stainings were consistent with the premise that Mrs. Stewart had been lying with her forehead on the lower part of the bedspread after she was shot.

. And, after examining the photographs of blood stains upon the headboard of the bed and extending up the wall above the headboard (Mrs. Stewart's blood, as shown by other evidence), Brown opined that the pattern of those stains was consistent with its source being thrown violently up toward the head of the bed after she had been lying with her forehead resting upon the lower part of a spread that covered the bed.

Stewart contends that the court erred in several respects in admitting Brown's testimony. First, Stewart claims that because he was given no written summary or report of Brown's conclusions, Brown's testimony was inadmissible as a consequence of the Commonwealth's violation of Rule 3A:11(b)(1), which provides in pertinent part:

> Upon written motion of an accused a court shall order the Commonwealth's attorney to permit the accused to *inspect and copy or photograph* any relevant (i) written or recorded statements or confessions made by the accused . . . or the *substance of any oral statements or confessions made by the accused* to any law enforcement officer, . . . and (ii) written reports of autopsies, ballistic tests, fingerprint analyses, handwriting analyses, blood, urine and breath tests, *other scientific reports*, and written reports of a physical or mental examination of the accused.

Rule 3A:11(b)(1) (emphasis added).

Stewart does not contend that Brown made a written report. However, according to Stewart, an oral "scientific report regarding blood spatter evidence is clearly discoverable [under this rule]," because the word "written" does not modify the words "other scientific reports," as in "[a]ll other provision[s] of the rule."

We find this argument unpersuasive because Stewart overlooks other language of the Rule permitting an accused to "inspect and copy or photograph" the documents described thereafter. Obviously, Stewart could not have "inspect[ed], cop[ied] or photograph[ed]" Brown's orally stated conclusions drawn from his inspection of the photographs. And, were the Rule intended to require the Commonwealth's Attorney to furnish Stewart with "the

substance of any [of an expert's] oral statements," it would so state as it does in the instance of an accused's unrecorded statements to a law enforcement officer.

■ Next, Stewart argues that the trial court erred in denying his motion for the appointment at public expense of an "independent" expert on the analysis of blood spatter evidence. Stewart cites no cases that indicate such assistance is required in order to provide the constitutionally required "basic tools of an adequate defense," *Britt v. North Carolina*, 404 U.S. 226, 227 (1971), and we find none. Consequently, we conclude that the Commonwealth is not required to provide funding for such assistance. *See Townes v. Commonwealth*, 234 Va. 307, 332, 362 S.E.2d 650, 664 (1987), *cert. denied*, 485 U.S. 971 (1988).

Next, Stewart argues that the court abused its discretion in denying his several motions for a continuance so that he could obtain an expert to assist in the cross-examination of Brown. On the morning Brown was to testify, Stewart's counsel advised the court that although he had talked to McGann the night before, he did not solicit McGann's assistance that morning in countering Brown's testimony because McGann had not seen the photographs, he was an agent of the Commonwealth, a friend of Brown's, and would have been "of minimal help at best."

■ After indicating that it could not assume that "all agents of the Commonwealth will always testify for the Commonwealth," and hearing that Brown had disclosed the substance of his testimony to defense counsel two days before, the court denied Stewart's motion for a continuance to search for some other expert in the field. Considering these facts, we cannot say that the trial court abused its discretion in this ruling.

Next, Stewart contends that Brown's blood spatter analysis evidence should not have been admitted during the guilt stage of the trial because it was not relevant to that issue. We disagree.

■ "For many years, we have approved the principle that every fact, however remote or insignificant, that tends to establish a probability or improbability of a fact in issue is admissible." *Stamper v. Commonwealth*, 220 Va. 260, 269, 257 S.E.2d 808, 815 (1979) (citations omitted), *cert. denied*, 445 U.S. 972 (1980). And, in view of the fact that Stewart contends he does not remember what he did in the house after shooting his wife and son, evidence which would indicate what he did with their bodies tends to establish that their murders were premeditated.

■ We reject Stewart's contention concerning the admissibility of Brown's testimony. He argues that the general reliability of blood spatter evidence was not established in this case. We approved the use of such evidence in *Compton v. Commonwealth*, 219 Va. 716, 727, 250 S.E.2d 749, 756 (1979).

## C. *Sufficiency of Evidence of Premeditation*

Stewart argues that "[b]ecause the events and conversations between the Defendant and Cynthia Stewart were unknown, it is equally likely that the Defendant acted out of anger and killed his wife . . . in the heat of passion [possibly caused by her refusal to reconcile], rather than by premeditation." Stewart also says the Commonwealth failed to prove beyond a reasonable doubt that he premeditated the killing of Jonathan.

■ Generally, the issue of premeditation is one for the jury. *McClung v. Commonwealth*, 215 Va. 654, 656, 212 S.E.2d 290, 292 (1975). However, a heat-of-passion defense is justified only where the killing arises upon *reasonable* provocation. *Barrett v. Commonwealth*, 231 Va. 102, 105-106, 341 S.E.2d 190, 192 (1986). Stewart cites no cases, and we are aware of none, indicating that a wife's rejection of a plea of reconciliation, without more, will provide the husband the reasonable provocation to create a heat-of-passion defense and reduce a charge of murder to manslaughter. In our opinion, Mrs. Stewart's alleged rejection of Stewart's plea of reconciliation was insufficient to create an issue of reasonable provocation under the circumstances of this case.[3]

Furthermore, the jury could have found premeditation for both murders from the statements Stewart made to Paul Brooks several days before the killings, Stewart's acquisition of a pistol prior to the visitation on the fatal date, and the evidence indicating his movements and activities at the scene of the crimes. Indeed, evidence that a weapon was placed against a victim's head when the fatal shot was fired, as the weapon was placed against Jonathan's head here, is sufficient alone to support a finding that "the shot was fired deliberately and with premeditation." *Townes*, 234 Va. at 335, 362 S.E.2d at 665. And we see very little difference between that act and

---

[3] Because the evidence of provocation was insufficient, it was not error for the trial court to refuse Stewart's proffered Instructions D and H, dealing with the defense of heat of passion; Instruction F, listing the grades of offenses, including manslaughter that the jury might consider; and Instruction J, explaining the difference between murder and manslaughter.

facing a person and firing a shot into their forehead from a distance of six inches or less, as Stewart did here in murdering his wife. Furthermore, Stewart's statement to Brooks that he, Stewart, "ought to go ahead and kill it and . . . just solve [the] problem [of visitation with his child]" is sufficient alone to justify the jury in concluding that Jonathan's murder was premeditated.

■ We conclude that this evidence was sufficient to support the conclusion that Stewart "fired [these shots] deliberately and with premeditation." Accordingly, the trial court did not err in refusing to strike the evidence of the first degree murder of Mrs. Stewart and the capital murder of Jonathan.

### D. *Sufficiency of Evidence to Prove Capital Murder*

Stewart argues that because "the events in the residence on the date of the offenses are unknown and the period of time unaccounted for is so great, the evidence is insufficient to show that the offenses were part of the same act or transaction." We disagree.

■ Two offenses are part of the same act or transaction "if they are connected so closely 'in time, place and circumstance that a complete account of one charge cannot be related without relating details of the other charge.' " *Woodfin v. Commonwealth*, 236 Va. 89, 92, 372 S.E.2d 377, 379 (1988) (quoting *State v. Fitzgerald*, 276 Or. 266, 273, 516 P.2d 1280, 1284 (1973)), *cert. denied*, 490 U.S. 1009 (1989). In our opinion, Stewart's inculpatory statements to the police, coupled with the circumstantial evidence in the case, establish beyond question that the murders of Mrs. Stewart and Jonathan are so connected with one another that a complete account of one cannot be related without relating details of the other. Accordingly, we conclude that the two offenses were "part of the same act or transaction," within the meaning of Code § 18.2-31(7).

### E. *Granting and Refusal of Instructions*

Stewart complains that the court should not have granted the following instructions, both offered by the Commonwealth, "because they say essentially the same thing" and are confusing. The pertinent parts of these instructions follow:

The Court instructs the jury that "willful, deliberate and premeditated" means a specific intent to kill, adopted at some

time before the killing, but which need not exist for any particular length of time.

[A]n intent to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill.

We do not regard these instructions as either duplicative or confusing. The second instruction makes more specific the length of time that must exist before the killing may be considered to have been premeditated, and also puts the necessary proviso upon a killing "only a moment before the fatal act is committed." The court did not err in granting these instructions.

Next, Stewart maintains that the court erred in refusing some of his proposed instructions, one of which was Instruction C, which read as follows:

THE COURT INSTRUCTS THE JURY THAT you have heard testimony in this case from an expert on blood spatters who testified for the Commonwealth. When you evaluate this testimony you may consider the fact that the Defendant did not have an opportunity to have [his] own expert evaluate the evidence independently or offer independent assistance in preparing a cross-examination of the Commonwealth's expert.

The court properly rejected this instruction. It is argumentative and contrary to the trial court's ruling that Stewart was not entitled to the appointment of an expert in the field of blood spatter analysis.

Because Stewart neither briefed nor argued his assignment of error relating to Instruction K, we do not consider it on appeal. Rule 5:27(e); *Eaton*, 240 Va. at 245, 397 S.E.2d at 390.

We find no merit in Stewart's objection to the court's method of numbering the Commonwealth's proposed instructions and placing letter designations on Stewart's proposed instructions.

## V. *PENALTY PHASE*

### A. *Dr. Centor's Testimony*

Code § 19.2-264.3:1(E) requires a defendant in a capital murder case to notify the Commonwealth (as Stewart did) of his intention "to present testimony of an expert witness to support a claim in

mitigation relating to the defendant's history, character or mental condition.'' Upon such notice, Code § 19.2-264.3:1(F) authorizes the court, upon motion of the Commonwealth, to appoint experts to evaluate the defendant ''concerning the existence or absence of mitigating circumstances relating to the defendant's mental condition at the time of the offense.'' Upon the Commonwealth's motion, Dr. Arthur Centor, a forensic clinical psychologist, was appointed for that purpose.

After his examination, Dr. Centor testified not only about mitigating circumstances but also about Stewart's future dangerousness. Stewart claims the court erred in three respects in admitting this testimony.

First, Stewart claims that Code § 19.2-264.3:1(F) limits Dr. Centor's role to that of making an evaluation of the presence or absence of mitigating circumstances and does not permit an evaluation of his future dangerousness. We disagree.

■ We have rejected a claim that a defendant's Fifth and Sixth Amendment rights under the United States Constitution were violated when an expert, who was appointed under the provisions of Code § 19.2-264.3:1(F), also expressed an opinion concerning his future dangerousness. *Savino v. Commonwealth*, 239 Va. 534, 544, 391 S.E.2d 276, 281-82, *cert. denied*, 498 U.S. 882, 111 S.Ct. 229 (1990). There, we said that the order entered pursuant to the provisions of Code § 19.2-264.3:1 gave sufficient notice that the proposed examination ''would be conducted by the Commonwealth's expert in an effort to produce evidence against Savino's interests.'' *Id.* Applying the rationale of *Savino*, we hold the provisions of Code § 19.2-264.3:1(F) do not limit the scope of the expert's examination to matters of mitigation.

Next, Stewart argues that because Dr. Centor's written report did not mention his opinion of Stewart's future dangerousness, his testimony on that subject was inadmissible. Stewart bases this contention upon that part of Code § 19.2-264.3:1(F) requiring that evaluating experts ''shall report their findings and opinions and provide copies of psychiatric, psychological, medical or other reports obtained during the course of the evaluation to the attorneys for the Commonwealth and the defense.''

■ Stewart does not claim that Dr. Centor prepared a written report on the subject of Stewart's future dangerousness. Nor does he dispute the trial court's factual finding that Stewart had an expert in the same field as Dr. Centor and that, at least a week prior to trial,

Stewart was told that Dr. Centor would testify about the issue of future dangerousness. Under these circumstances, we conclude that the court did not err in permitting this testimony.

■ The trial court ruled that Dr. Centor could not use any statement made to him by Stewart as part of the basis forming his opinion of Stewart's dangerousness. Dr. Centor testified that his opinion of future dangerousness was based on the circumstances of these cases, Stewart's prior criminal record, and the results of Stewart's psychological tests.

Dr. Centor testified that he did not use any statements made by Stewart in the interviews between them. Stewart argues, however, that "it is absurd in the extreme to assume that" Dr. Centor did "not base his opinions on 'disclosures or statements by Defendant during the interview.'" However, Stewart cites nothing in the record, and we find nothing, to support his assertion.

Stewart's final contention as to the inadmissibility of Dr. Centor's future-dangerousness testimony is that the admission of this testimony violated Stewart's Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution. The question of an alleged violation under the circumstances of a defendant's Fifth and Sixth Amendment rights was resolved adversely to this contention in *Savino*, 239 Va. at 543-44, 391 S.E.2d at 281-82, and we find no reason to modify those rulings. And, because Stewart does not claim that any constitutional rights other than his Fifth and Sixth Amendment rights were implicated in an application of his Fourteenth Amendment rights to the action of the trial court, *Savino* also controls our decision on this issue. Accordingly, we find no merit in this contention.

## B. *Refused Instruction and Verdict Form*

Stewart complains that the instructions and the verdict form inadequately instruct and inform the jury concerning mitigation. He concludes that they "inhibit" the jury's consideration of evidence of mitigation.

The court instructed the jury that even if the Commonwealth proved the "vileness" and "future dangerousness" predicates of the capital murder statute beyond a reasonable doubt, "if [the jury believed] from all the evidence that the death penalty is not justified," it could fix the punishment at imprisonment for life. The

court also told the jury that "mitigating factors are those circumstances which do not justify or excuse the offense, but which in fairness or mercy may be considered as extenuating or reducing the degree of moral culpability and punishment."

Contending that these instructions were inadequate to instruct on mitigating factors, Stewart tendered Instruction B, which provided in pertinent part:

THE COURT INSTRUCTS THE JURY THAT if you find that the Commonwealth has proven any one or more aggravating circumstances beyond a reasonable doubt you may, after considering the defendant's evidence raised in mitigation, impose a sentence of Life in the penitentiary.

■ Stewart also argues that Instruction B should have been granted because it "would give the juror a clear statement of the law and help overcome the shortcomings of the jury verdict form which was submitted." We do not agree. In our opinion, the court fully instructed the jury on the issue of mitigation and did not err in refusing to grant an essentially duplicative instruction on the subject. *Eaton*, 240 Va. at 257, 397 S.E.2d at 398.

The trial court submitted to the jury the verdict form prescribed by Code § 19.2-264.4(D). Stewart contends the form "underinforms and inhibits the consideration of mitigation in the manner required by law." However, we rejected substantially the same contention in *Stockton v. Commonwealth*, 241 Va. 192, 215, 402 S.E.2d 196, 209, *cert. denied*, 502 U.S. ___, 112 S.Ct. 280 (1991). Perceiving no reason to depart from our decision in *Stockton*, we reject Stewart's contention here.

### C. *Sufficiency of Evidence of "Vileness"* ˈ

Emphasizing that "depravity of mind" was the only element submitted to the jury on the issue of "vileness," Stewart contends that the jury could not have found depravity of mind from his conduct. We have defined "depravity of mind," as used in Code § 19.2-264.2, as "a degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation." *Thomas v. Commonwealth*, 244 Va. 1, 25, 419 S.E.2d 606, 619-20, *cert. denied*, ___ U.S. ___, 113 S.Ct. 421

(1992) (quoting *Smith v. Commonwealth*, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), *cert. denied*, 441 U.S. 967 (1979)).

Stewart likens his case to the multiple murder of the defendant's wife and mother-in-law in *Godfrey v. Georgia*, 446 U.S. 420 (1980). In *Godfrey*, the Supreme Court held that the Georgia capital murder statute was applied unconstitutionally because the evidence was insufficient to show that these murders were more " 'depraved' than that of any person guilty of murder." *Id.* at 433. The defendant in *Godfrey* killed his estranged wife by firing a shotgun through a window as she was playing a card game inside her mother's residence. He then entered the residence and killed his mother-in-law, who, the defendant thought, was encouraging his wife to reject his reconciliation pleas. The defendant killed his mother-in-law by firing a shotgun blast into her head from an unstated distance, and immediately called the police to report the crimes. Although the defendant struck his 11-year-old daughter on the arm with the barrel of his shotgun, he did not kill her. *Id.* at 425.

In contrast, Stewart apparently held his gun to the heads of his wife and five-month-old child, killed them in deliberate execution-type murders, carefully arranged their bodies, secured the house, and then fled. In our opinion, these facts, coupled with the other facts discussed herein, amply support the jury's finding that Stewart's murders were "more depraved" than ordinary murders and exhibited the degree of moral turpitude defined in *Smith*, 219 Va. at 478, 248 S.E.2d at 149. Accordingly, we conclude that the jury justifiably found these murders to be "outrageously or wantonly vile, horrible or inhuman." Code § 19.2-264.2.

D. *Sufficiency of Evidence of "Future Dangerousness"*

Stewart contends that the crimes he committed that Sunday, his prior criminal record, and Dr. Centor's opinion that he showed a "possibility of future dangerousness" were insufficient to support the jury's finding of his future dangerousness. We need not consider this argument because, as we have indicated, the jury's separate finding of "vileness" supports the sentence. *Tuggle v. Commonwealth*, 230 Va. 99, 110-11, 334 S.E.2d 838, 845-46 (1985), *cert. denied*, 478 U.S. 1010 (1986); *accord Zant v. Stephens*, 462 U.S. 862, 884 (1983).

## VI. SENTENCE REVIEW

Code § 17-110.1(C) requires that we review the imposition of Stewart's death sentence to determine whether the sentence: (1) was imposed under the influence of passion, prejudice, or any other arbitrary factor; or (2) is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

### A. *Passion, Prejudice or Other Arbitrary Factors*

Stewart argues that the death sentence was imposed upon him under the influence of "passion, prejudice or other arbitrary factors." However, Stewart is unable to point to anything specific in the record that demonstrates any of these factors.

Nevertheless, Stewart reasserts many of his earlier arguments and claims that the effect of the trial court's failure to rule favorably upon his contentions and the closing arguments to the jury demonstrate the validity of his argument. Neither of these claims is well-founded. On the contrary, consideration of the several assignments of error discloses that the trial court ruled correctly upon each of the objections Stewart raises on his appeal.

Our independent review of the record, conducted pursuant to Code § 17-110.1(C)(1), including consideration of the aggravating factor of "vileness" as well as mitigating factors, discloses nothing to support the contention that the sentence of death was imposed under the influence of "passion, prejudice or other arbitrary factor."

### B. *Excessiveness and Disproportionality*

The issue of proportionality is resolved by a consideration of whether "juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes." *Davidson v. Commonwealth*, 244 Va. 129, 136, 419 S.E.2d 656, 660, *cert. denied*, ___ U.S. ___, 113 S.Ct. 423 (1992) (quoting *Smith v. Commonwealth*, 239 Va. 243, 271, 389 S.E.2d 871, 886, *cert. denied*, 498 U.S. 882, 111 S. Ct. 221 (1990) (quoting *Stamper v. Commonwealth*, 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979), *cert. denied*, 445 U.S. 972 (1980)). The only argument Stewart makes as to any excessiveness or disproportionality of his death sentence is that there are no recent

Virginia cases "where the death penalty has been imposed under circumstances similar to the one at the case at bar."

If that were the test, however, a death sentence could never be imposed where there are no previous cases similar to the one at bar. As we have said, "no concept of proportionality requires that each new capital murder case equal in horror the worst possible scenario yet encountered, else the death penalty may not be imposed." *Stockton*, 241 Va. at 218, 402 S.E.2d at 211 (quoting *Turner v. Commonwealth*, 234 Va. 543, 556, 364 S.E.2d 483, 490, *cert. denied*, 486 U.S. 1017 (1988)).

Our accumulated records of all capital felony cases, prepared pursuant to § 17-110.1(E), have been reviewed as a guide to determine whether Stewart's death sentence is excessive or disproportionate. This compilation revealed a number of cases in which the capital penalty was based upon the "vileness" predicate, as in Stewart's case. Those cases are collected in *Thomas*, 244 Va. at 26-27, 419 S.E.2d at 621, and *Jones v. Commonwealth*, 228 Va. 427, 450 n.3, 323 S.E.2d 554, 567 n.3 (1984), *cert. denied*, 472 U.S. 1012 (1985). We also considered *Davidson*, decided the same day as *Thomas*.

■ Our review of these cases, as well as cases in which life imprisonment was imposed, and our consideration of the present crime and this defendant, convinces us that Stewart's sentence of death was neither excessive nor disproportionate.

## VII. CONCLUSION

We find no reversible error. Having reviewed the sentence of death pursuant to Code § 17-110.1, we decline to set it aside. Therefore, we will affirm the judgments entered in both cases.

Record No. 921500—*Affirmed.*
Record No. 921501—*Affirmed.*