**AMENDED OPINION**

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

KENNETH MANUEL STEWART, JR.,
Petitioner-Appellant,

v.

No. 97-26

RONALD ANGELONE, Director,
Virginia Department of Corrections,
Respondent-Appellee.

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
James C. Turk, District Judge.
(CA-96-708-R)

Argued: April 6, 1998

Decided: May 29, 1998

Before WIDENER, HAMILTON, and MOTZ, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Michele Jill Brace, VIRGINIA CAPITAL REPRESEN-
TATION RESOURCE CENTER, Richmond, Virginia, for Appellant.
Pamela Anne Rumpz, Assistant Attorney General, OFFICE OF THE
ATTORNEY GENERAL, Richmond, Virginia, for Appellee. **ON
BRIEF:** Mark E. Olive, Tallahassee, Florida, for Appellant. Mark L.

Earley, Attorney General of Virginia, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

A Virginia jury convicted Kenneth Manuel Stewart, Jr., of murdering his wife and infant son; the state court, on recommendation of the jury, sentenced Stewart to death. After pursuing direct appeals and post-conviction relief in state court, Stewart petitioned for federal habeas relief. The district court dismissed his petition. We affirm.

I.

A.

On February 7, 1992, a jury convicted Stewart of the first-degree murder of his wife, Cynthia Stewart, the capital murder of his six-month-old son, Jonathan, and two charges of using a firearm in the commission of these murders. The court sentenced Stewart to life imprisonment for the murder of his wife and six years imprisonment for the firearm convictions. The jury recommended that Stewart receive the death penalty for the murder of his son, based on the aggravating factors of "vileness" and "future dangerousness." See Va. Code 19.2-264.4 (Michie 1994). The trial court imposed the sentence recommended by the jury.

On February 26, 1993, the Virginia Supreme Court affirmed the convictions and death sentence. Stewart v. Commonwealth, 427 S.E.2d 394 (1993), cert. denied sub nom., Stewart v. Virginia, 510 U.S. 848 (1993).

Although counsel had been appointed to prepare Stewart's state post conviction petition, in February 1994 Stewart requested in writing that the court order termination of all work on the petition and schedule an execution date. On February 8, 1995, Stewart appeared before the court to explain his reasons for seeking immediate execution. The court ordered a mental examination with respect to Stewart's competency and tentatively scheduled execution for April 12, 1995. On March 28, 1995, the court vacated the April 12 execution date based on the mental health expert's assessment of Stewart. Stewart's counsel filed a state habeas petition; it was dismissed by the Virginia Supreme Court on March 18, 1996.

On January 21, 1997, Stewart filed his federal habeas corpus petition in the United States District Court for the Eastern District of Virginia. On August 5, 1997, after hearing argument of counsel but without permitting presentation of additional evidence, the district court issued a well-reasoned fifty-two page opinion, denying all relief and dismissing the petition. After the court denied Stewart's motion to alter or amend its judgment, he appealed to this court.

B.

The Virginia Supreme Court, on direct appeal, recounted the facts of the case:

> For some time prior to the December 10, 1990 birth of their child, Jonathan, Stewart and his wife had been living in a house owned by her parents in Bedford County. Stewart lost his job the following February, and the couple separated in early April 1991. Mrs. Stewart and Jonathan remained in the house, and Stewart moved to a trailer occupied by his friend Paul Brooks. Stewart was not permitted to take Jonathan from the house, and could only visit him while Mrs. Stewart was at home. When Stewart returned from those visits, he expressed anger to Brooks because of the alleged interference of his wife's parents in his affairs and because of the restrictions placed upon his visitations with Jonathan. On one of these occasions, Stewart made a remark to Brooks to the effect that "I just ought to go ahead and kill it and get it over with, just solve this problem."

3

On Sunday afternoon, May 12, 1991, armed with a .25-caliber semi-automatic pistol concealed in his boot, Stewart went to visit Jonathan. During this visitation with Jonathan, Stewart claimed that he unsuccessfully attempted to persuade Mrs. Stewart to reconcile with him. After Mrs. Stewart's alleged rejection of his pleas, Stewart shot her twice.

Although Stewart remembered shooting Mrs. Stewart, initially he claimed that he remembered nothing after that shooting until he found himself driving on a New York freeway. Accordingly, the sequence of events at the scene can be reconstructed only from the following inferences that could reasonably be drawn from the physical evidence at the scene, and from the tesimony of expert witnesses who interpreted the physical evidence and photographs of such evidence. Stewart shot Mrs. Stewart in an upstairs bedroom. He fired the first shot into Mrs. Stewart's head just above the bridge of her nose at a range of six inches or less, as the two stood facing each other. When Mrs. Stewart fell, her forehead came to rest on the surface of a nearby bed, close to its foot. Stewart then fired a second shot about two inches above Mrs. Stewart's front hairline into the frontal area of her skull as she lay on the bed. Later, Stewart went downstairs, where he killed Jonathan by firing two shots into the side of his head, near his ear. One shot was fired at a range of no more than an inch or two. Stewart then carried Jonathan's body upstairs and placed it in the arms of Mrs. Stewart's body. Some time before, Stewart had moved Mrs. Stewart's body closer to the head of the bed with some force, causing her blood to spatter on the wall above the headboard. Stewart then turned off the kitchen stove in which Mrs. Stewart had been cooking a casserole, put the family dogs on the back porch, closed both porch doors so that the dogs could not get out, turned on Mrs. Stewart's telephone answering machine, got her house key, and locked the house. Thereafter, Stewart took his wife's car, rather than his older pickup truck, and drove it to New York State. As Stewart was driving through Bedford County, he threw the gun into undergrowth some distance from the road.

4

Approximately seven o'clock that same evening, Ruth Schultz, Mrs. Stewart's mother, came to the house from her nearby residence. After noticing blood in Jonathan's play pen, Mrs. Schultz went upstairs, where she found the bodies of her daughter and grandson on the bed. About 3:00 or 4:00 a.m. on Tuesday morning, Stewart telephoned his friends Carolyn and Paul Brown, who lived in Bedford County, from Cleveland, Ohio, and told them that he had killed his wife and son and planned to "turn himself in" to the police. Shortly after noon on Wednesday, the police in a Cleveland suburb arrested Stewart for public intoxication and disorderly conduct. At first, Stewart told the police that he lived in Cleveland. However, after receiving information from the National Criminal Information Center that there was "a double homicide warrant [for Stewart's arrest] out of Bedford County, Virginia," the police arrested Stewart on that charge and notified the sheriff's office in Bedford County.

Stewart v. Commonwealth, 427 S.E.2d at 398-99.

II.

Stewart initially asserts that the district court erred in rejecting his claim that he provided evidence of his actual innocence in his habeas petition. On habeas review, we review de novo a claim of actual innocence. Satcher v. Pruett, 126 F.3d 561, 570 (4th Cir. 1997).

Demonstration of innocence of the crime charged opens the "gateway" permitting a court to consider any defaulted claims of constitutional error. See Schlup v. Delo, 513 U.S. 298 (1995). In Schlup, the Supreme Court held that in order to pass through this "gateway" a defendant must provide "new reliable evidence" of his innocence "that was not presented at trial" and establish that it is more likely than not that "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." Id. at 324 and 329.

Stewart maintains that the affidavit of Dr. Donald Morgan provides such evidence. Specifically, Stewart asserts that this affidavit supports Stewart's contention that at the time he killed his wife and child he

5

suffered from a temporal lobe epilepsy. In this affidavit, Dr. Morgan relates that he "interview[ed]" Stewart once, and that this interview was after Stewart's conviction and sentencing. Dr. Morgan states that he "conducted a preliminary review" of Stewart's case, which included review of the reports, administered tests, and affidavits of the other doctors that had examined Stewart in the past. On the basis of this "preliminary review," Dr. Morgan concluded that Stewart "may suffer from temporal lobe epilepsy." (Emphasis added).

Dr. Morgan based this conclusion principally on the report issued by Dr. Robert Brown, the court-appointed mental health expert who testified on Stewart's behalf at trial. Dr. Brown had concluded that Stewart did not suffer from any mental illness that would have affected his actions at the time of the offenses. Dr. Brown did note, however, that prior to committing the murders Stewart stated he experienced a foul smell and headache, that Stewart lacked "specific memory of the incident or the events immediately following the incident," and that certain tests suggested Stewart suffered from convulsions, fainting spells, headaches, and weakness. Dr. Morgan concluded that the smell, lack of memory, and tests results indicated Stewart "may suffer from temporal lobe epilepsy." Stewart asserts that Dr. Morgan's opinion provides the requisite support to show that Stewart in fact suffered from a temporal lobe disorder and therefore did not have the requisite mens rea at the time of the killings.

At oral argument, defense counsel acknowledged, as he had to, that in concluding that it was possible that Stewart suffered from temporal lobe epilepsy, Dr. Morgan did not utilize any information that was not available to Dr. Brown, Stewart's court-appointed trial expert. Moreover, in his report Dr. Morgan specifically recognized that "Dr. Brown's report indicates his awareness of numerous specific indicators of temporal lobe epilepsy" and "awareness of numerous general indicators of organic brain damage." Even so, Dr. Brown, who examined and tested Stewart in 1991, less than a year after the murders, did not conclude that Stewart suffered from temporal lobe epilepsy.

The district court found that Dr. Morgan's affidavit did not constitute "new evidence" under Schlup. Reviewing this determination de novo, see Satcher, 126 F.3d at 570, we agree with the district court's conclusion. Dr. Morgan made his preliminary evaluation and conclu-

6

sion based on the same information as Dr. Brown. The fact that Dr. Morgan drew a different conclusion from such information does not mean that such a differing opinion constitutes "new evidence" under Schlup. Stewart's real contention, addressed later in this opinion, appears to be with respect to Dr. Brown's effectiveness and competency. Thus, Dr. Morgan's affidavit concludes that "a competent forensic psychiatrist [should have] order[ed]" additional tests in order to pursue the possibility that Stewart suffered from a temporal lobe disorder.

In sum, Stewart has not identified "new evidence" to support his innocence, but rather has obtained the opinion of an additional mental health expert on the same evidence as was analyzed by his court-appointed mental health expert prior to trial. This new expert opinion does not meet Schlup's "new evidence" requirement. See Bannister v. Delo, 100 F.3d 610, 618 (8th Cir.), cert. denied, 117 S. Ct. 2526 (1997) ("putting a different spin on evidence that was presented to the jury does not satisfy the requirements set forth in Schlup."). Cf. Jones v. Delo, 56 F.3d 878, 883 (8th Cir.), cert. denied, 116 S. Ct. 1330 (1996) (mental health experts who had testified at trial that defendant was capable of deliberation and then changed their opinions to conclude on habeas review that defendant suffered from an organic brain disease at the time of the offenses was found to be "new evidence").

After this case was argued, the Supreme Court issued its opinion in Calderon v. Thompson, ___ S. Ct. ___, 1998 WL 204593 (Apr. 29, 1998). Stewart contends that Thompson supports his position that Dr. Brown's affidavit is "new evidence" under Schlup. In fact, Thompson did not discuss what evidence constitutes new evidence under Schlup, let alone suggest that a pathologist's testimony offered on federal habeas review disputing the opinions of trial experts constituted such "new evidence." Rather, the Thompson Court simply focused on the fact that the proffered "new evidence" was not so persuasive so as to establish that "no reasonable juror would have convicted [the petitioner] of rape if presented with the testimony." Id. at *18.

Even if Thompson did support Stewart's contention that he has identified "new evidence," as in Thompson , that evidence is not sufficient under Schlup, which requires a "substantial showing" in order to establish actual innocence. Schlup, 513 U.S. at 330. As noted

7

above, Dr. Morgan did not even conclude that Stewart in fact suffered from temporal lobe disorder but only tentatively concluded that he may suffer from such a disorder. That tentative conclusion differed from the opinion of experts who examined Stewart much closer to the time when he committed the crimes. Both Dr. Brown and the Commonwealth's mental health expert, Dr. Arthur Centor, conducted extensive examinations of Stewart in 1991, a few months after the murders, and concluded that he did not have such a mental illness at the time he committed the offenses.

Moreover, the Commonwealth presented extensive evidence at trial that supported the trial experts' opinions that Stewart did not suffer any mental illness at the time he murdered his wife and child, but rather acted with care and deliberation. For example, although Stewart owned a rifle, he stole a friend's handgun on the day of the murders, hid that gun in his boot before entering his wife's house, and used it to kill his wife and child. Further, he smoked a cigarette before leaving the scene of the crime, put the dogs on the back porch, locked the door to the house, turned on the answering machine and, upon departing, took his wife's newer car rather than his own. In his statements to police after the killings, Stewart indicated that he had planned the killings because of his frustration over the separation from his wife.

Perhaps in at least implicit recognition of his failure to present new evidence under Schlup, Stewart contends that any failure in his proof resulted from the district court's refusal to order he be transported to obtain brain scans "that were necessary to confirm Dr. Morgan's diagnosis." Brief of Appellant at 23. Under 21 U.S.C.A. § 848(q)(9) (West 1998), if a court finds that "investigative, expert, or other services are reasonably necessary for the representation of the defendant . . . the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant." See In re Pruett , 133 F.3d 275, 279 (4th Cir. 1997).

Although the magistrate judge initially found that"Stewart [wa]s entitled to have the testing performed in order to discover potential evidence," the district court later denied Stewart's motion to order his transport for such testing. The court reasoned that the testing would not be "new evidence" under Schlup because Stewart "could have

received this testing prior to trial, but he did not based on the independent judgment of his expert and his lawyers."

The district court did not err in so holding. The brain scans would, at most, have supported Dr. Morgan's tentative opinion. They could not have eliminated the fact that Stewart's court-appointed mental health expert, Dr. Brown -- based on the same evidence available to Dr. Morgan -- years earlier concluded that such testing was not necessary. Thus, such testing would only permit Stewart to put a "different spin" on the opinion as to his mental health from that provided at trial by Dr. Brown. See Bannister, 100 F.3d at 618.

III.

Stewart contends that his mental health trial expert, Dr. Brown, was deficient in his performance and that this prejudiced Stewart's defense. He asserts that Dr. Brown "gave counsel misleading and prejudicial information about the effects of Pamelor, the drug Stewart took to excess the night before the crime," and that Dr. Brown was aware of other signs of organic brain injury, "but he unreasonably failed to order tests" to make further determination in this regard. Brief of Appellant at 35-6.

These asserted errors provide Stewart with the basis for two arguments: (a) Dr. Brown himself assertedly "rendered ineffective assistance," and (b) Dr. Brown's assertedly "deficient performance is imputed to counsel" rendering defense counsel's assistance ineffective.

A.

Stewart's contention that Dr. Brown himself rendered constitutionally "ineffective assistance" is meritless.

First, as the district court pointed out, this claim is procedurally defaulted. Stewart presented it in his state habeas petition and it was found barred under Slayton v. Parrigan, 205 S.E. 680 (Va. 1974), because Stewart failed to raise it at trial or on direct appeal. See Gray v. Netherland, 116 S. Ct. 2074, 2080 (1996). Stewart points to no sup-

9

port for his argument that the first opportunity he had to raise this claim was at the state habeas level. Rather, Stewart could have challenged Dr. Brown's performance on direct appeal. See, e.g., Pruett v. Commonwealth, 351 S.E.2d 1, 6-7 (Va. 1986) (counsel challenged expert's performance on direct appeal by requesting an additional expert).**1**

Even if we were to reach the substance of Stewart's claim, however, his argument fails. In Ake v. Oklahoma, 470 U.S. 68, 83 (1986), the Supreme Court held that when an indigent defendant's criminal responsibility is put in issue the state must provide the defendant with "access to a competent psychiatrist." Ake 's holding that "due process requires access to a psychiatric examination on relevant issues" does not extend to a guarantee of "effective assistance" from a mental health expert. Id. at 84.

Stewart does not contend that Dr. Brown is generally incompetent. Rather, Stewart argues that Dr. Brown's actions in this case did not meet acceptable, effective standards. Thus, in making the argument that he was entitled to "effective assistance" of a mental health expert, Stewart asks us to create a "new rule" of constitutional law. See Poyner v. Murray, 964 F.2d 1404, 1419 (4th Cir. 1992) (noting that "there is no separately-cognizable claim of ineffective assistance of expert witnesses"). In Poyner, as here, a defendant challenged the performance of his mental health experts on habeas review. We held that the defendant's constitutional rights were not violated simply because the expert "fail[ed] to identify every possible malady or argument, no matter how tenuous." Id. at 1419.

_____

**1** Stewart asserts that Pruett can be distinguished because the defendant there requested the appointment of a second expert rather than simply challenging the effectiveness of his first expert on direct appeal. Pruett, 351 S.E.2d at 6. But in essence Pruett's claim is identical to Stewart's in that both challenged the competency and effectiveness of their appointed mental health trial expert. In Pruett , the Supreme Court of Virginia rejected this claim in ruling that the defendant's appointed expert was "competent" and that "Pruett has no right to `shop around' at state expense until he finds a doctor who will give him the opinion he wants." Id. at 7.

10

Moreover, even if we were to recognize at this juncture a constitutional right to the "effective assistance" of a mental health expert, that right would not assist Stewart. This is so because the Supreme Court has expressly proclaimed such "new rules" are not to be applied retroactively on habeas review. Teague v. Lane, 489 U.S. 288, 300-01 (1989).

B.

Stewart also asserts that Dr. Brown's performance should be imputable to Stewart's counsel and therefore his counsel rendered ineffective assistance at trial. He contends that Dr. Brown was not properly supervised and consequently did not investigate critical information with respect to Stewart's behavior.

In Poyner, we noted "that there is no separately-cognizable claim of ineffective assistance of expert witnesses does not mean that a substandard performance by a psychiatrist at trial could never form the basis for habeas corpus relief." 964 F.2d at 1419. Thus, we reasoned that the deficient performance "must be that of counsel." Id. Upon reviewing the record in Poyner, we noted that Poyner had been evaluated for a possible mental disability and we concluded the fact that defendant's counsel did not "shop around for a psychiatrist willing to testify to the presence of more elaborate or grave psychological disorders simply does not constitute ineffective assistance." Poyner, 964 F.2d at 1419.

Similarly, the record here does not support the conclusion that Stewart's counsel was deficient in his handling of expert testimony. Stewart had been evaluated for a possible mental disability, and based on Dr. Brown's analysis and the fact that Stewart had informed Dr. Brown that he had taken his medication as prescribed, counsel was not ineffective in relying on Dr. Brown's diagnosis and concluding that Stewart was not intoxicated (by the Pamelor or otherwise) when he committed the murders. With respect to Stewart's claim that he suffered from organic brain damage, both Dr. Brown and the Commonwealth's expert, Dr. Centor, performed neurological examinations and concluded that there was no need to administer further tests to look for such damage. Clearly, defense counsel was not deficient in relying on this professional judgment. See Hendricks v. Calderon,

11

70 F.3d 1032, 1038 (9th Cir. 1995) ("If an attorney has the burden of reviewing the trustworthiness of a qualified expert's conclusion before the attorney is entitled to make decisions based on that conclusion, the role of the expert becomes superfluous."); Poyner, 964 F.2d at 1419-1420.**2**

Finally, Stewart's claim that Dr. Brown and defense counsel failed to investigate his family's history of mental illness is meritless because it overlooks evidence in the record. A review of the record reveals that Dr. Brown knew about much of this information and, in fact, testified that "virtually every family member has needed emotional or psychiatric care." Furthermore, Dr. Brown's report contained a section entitled "Personal and Family History" and his testimony indicated that he knew of mental health problems in Stewart's family.

IV.

Stewart's next group of challenges center on the"depravity of mind" factor, which provided one of the basis for his capital sentence. See Va. Code § 19.2-264.2. A defendant possesses "depravity of mind" under Virginia law when he possesses "a degree of moral turpitude and physical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation." Stewart, 427 S.E.2d at 409 (quoting Thomas v. Commonwealth, 419 S.E.2d 606, 619-20 (Va. 1992)).

First, Stewart argues that the jury instruction defining depravity of mind was unconstitutionally vague "as applied" in his case. In addition, Stewart contends that the Virginia Supreme Court did not make an independent determination that the death penalty was appropriate so as to cure this asserted instructional error. Finally, Stewart maintains that Government presented insufficient evidence to support a finding of depravity of mind. We consider each contention in turn.

_____

**2** In addition, Dr. Brown's expert opinion provided defense counsel with no basis to make an insanity defense because he concluded that Stewart was sane at the time of the murders.

A.

The court instructed the jury that:

> Before the penalty can be fixed at death, the Common-wealth must prove beyond a reasonable doubt at least one of the following two alternatives:
>
> Number one, that after consideration of his history and background, there is a probability that he would commit criminal acts of violence that would constitute a continuing threat to society. Or number two, that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind <u>beyond the minimum necessary to accomplish the act of murder</u>.

(Emphasis added).

The Commonwealth agrees with Stewart that the court should not have included the emphasized language -- "beyond the minimum necessary to accomplish the act of murder" -- in defining the depravity of mind factor. <u>See</u> Brief of Appellee at 17 n.6.[3] However, Stewart's challenge to this instruction "as applied" is procedurally defaulted because he did not raise this challenge at trial, on direct appeal, or during the state habeas proceedings. <u>See Gray</u>, 116 S. Ct. at 2080-81.

Stewart contends that the Commonwealth acknowledged that his challenge to the instruction "was raised and decided on the merits in state court on direct appeal." Reply Brief at 11. Thus, Stewart maintains that since the Commonwealth recognized his constitutional challenge to the instruction in the district court, it cannot now raise procedural default. <u>See Gray</u>, 116 S. Ct. at 2082. In fact, the record indicates that the Commonwealth was not referring to a constitutional challenge to the jury instructions as applied when it stated before the

_____

**3** The jury's verdict also stated a finding with respect to depravity of mind that included this language.

13

district court that "[t]he Virginia Supreme Court, on direct appeal, reasonably rejected this contention."

B.

Even if this argument were not defaulted, on direct appeal the Supreme Court of Virginia cured any defect in the jury instructions in Stewart's case by making an independent finding with respect to depravity of mind. Stewart does not dispute that upon reviewing the constitutionality of an aggravating circumstance as applied in a particular case we cannot "focus[ ] exclusively on the jury . . . without inquiring whether the necessary finding of [the aggravating factor] has been made by the . . . state appellate court." Cabana v. Bullock, 474 U.S. 376, 389 (1986). However, Stewart claims that in this case the Virginia Supreme Court did not make such an independent finding with respect to the depravity of mind instruction.

Stewart excludes part of the appellate court's language in contending that the Virginia Supreme Court merely upheld the jury's finding of depravity of mind rather than making an independent determination. See Reply Brief at 14. Quotation of the entire relevant sentence in Virginia Supreme Court's opinion with respect to this issue reveals that the court did in fact make such an independent finding:

> In our opinion, these facts, coupled with the other facts discussed herein, amply support the jury's finding that Stewart's murders were "more depraved" than ordinary murders and exhibited the degree of moral turpitude [to justify the death penalty].

427 S.E.2d at 409 (emphasis added). Based on this analysis by the Virginia Supreme Court, the district court did not err in concluding that the Virginia Supreme Court "properly considered and rejected Stewart's challenges" with respect to the "depravity of mind" issue.

C.

Stewart also argues that the evidence in this case does not support a finding of depravity of mind. In making this argument, Stewart

14

relies upon Godfrey v. Georgia, 446 U.S. 420, 422 (1980), in which the trial court instructed that the defendant could be sentenced to death if the jury found beyond a reasonable doubt that the offense "was outrageously or wantonly vile, horrible or inhuman in that it involved . . . depravity of mind." The Godfrey Court upheld the instruction but refused to uphold its application to Godfrey's case, and thus reversed the capital sentence that had been imposed. After close scrutiny of the record, the Court concluded that Godfrey's "crimes cannot be said to have reflected a consciousness materially more `depraved' than that of any person guilty of murder." Id. at 433.

In light of Godfrey, we must similarly closely examine the record and determine whether Stewart's crimes reflect "a consciousness materially more `depraved' than that of any person guilty of murder." Id. We conclude that in this case the findings of the jury and the Virginia Supreme Court that Stewart's actions demonstrated the requisite depravity of mind are amply supported by the evidence. Contrary to Stewart's assertions, his crimes are in important respects "more `depraved'" than Godfrey's.

Both Godfrey and Stewart killed two members of their family, including their wives; however, one of Stewart's two victims was his infant son, while Godfrey spared the life of his child. Moreover, unlike Godfrey, Stewart did not call the police immediately after the murders. Rather, Stewart carried his dead infant child up the stairs of the house and arranged his wife's body with that of their child. Furthermore, while Godfrey fired a shotgun through a window in killing his wife and then killed his mother-in-law from an unstated distance, "Stewart apparently held his gun to the heads of his wife and five-month-old child [and] killed them in deliberate execution-type murders." 427 S.E.2d at 409.

The record also reveals that Stewart had partially smoked a cigarette while in the house, suggesting as the Commonwealth points out that he "paused a while to observe his handiwork." Brief of Appellee at 22. In addition, Stewart turned off the oven, activated the telephone answering machine, put his wife's dogs on the back porch, and locked the door before leaving the murder scene in order to avoid someone quickly detecting the murders -- all acts that indicate deliberativeness and lack of remorse further distinguishing Stewart's case from God-

15

frey's. Moreover, Stewart disposed of the murder weapon along the highway after he left the murder scene in his wife's newer car rather than his own. Stewart then fled the state and was not apprehended until days later. These facts make his conduct utterly unlike that of Godfrey, who immediately turned himself in to the authorities. Godfrey, 446 U.S. at 432. Moreover, that Godfrey immediately "acknowledged his responsibility and the heinous nature of his crimes" was found particularly noteworthy by the Supreme Court in concluding the evidence of depravity was insufficient to justify imposition of the death penalty on Godfrey. 446 U.S. at 433.

In sum, unlike Godfrey's case, the Commonwealth did present sufficient evidence so that a reasonable jury could conclude beyond a reasonable doubt that Stewart's actions "reflected a consciousness materially more `depraved' than that of any person guilty of murder." Id.

V.

Stewart maintains that the trial court's jury instructions violated his Eighth and Fourteenth Amendment rights. The court instructed the jury at the penalty phase:

> If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt either of the two[aggravating factors], and as to that [factor] you are unanimous, then you may fix the punishment of the Defendant at death, or if you believe from all the evidence that the death penalty is not justified, then you shall fix the punishment of the Defendant at imprisonment for life.

Stewart contends that based on this instruction reasonable jurors could have believed that if they found an aggravating factor present they could impose the death penalty without considering any mitigating evidence.

As Stewart acknowledges, this "is the same instruction whose constitutionality is being scrutinized by the Supreme Court in Buchanan v. Angelone." Brief of Appellant at 46. On January 21, 1998, the

16

Supreme Court rejected this constitutional challenge. See Buchanan v. Angelone, 118 S. Ct. 757 (1998). The Court held that such an instruction "did not violate the Eighth and Fourteenth Amendments." Id. at 758. Stewart advances no arguments different than those presented and rejected in Buchanan. Accordingly, Stewart's constitutional challenge to these jury instructions must fail.

VI.

Stewart argues that Dr. Centor's trial testimony with respect to Stewart's future dangerousness violated his constitutional rights. He notes that Dr. Centor stated during his testimony that his opinion was inter alia "based on statements that were made by the Defendant." Brief of Petitioner-Appellant at 49. Stewart points out that Va. Code 19.2-264.3:1(G) (Michie 1994) prohibits the government from using statements a defendant makes during a capital sentencing evaluation to prove aggravating circumstances like future dangerousness, and apparently maintains that this statute sets minimum constitutional standards.

We recently rejected a claim nearly identical to Stewart's in another case in which Dr. Centor testified as to a defendant's future dangerousness. See Savino v. Murray, 82 F.3d 593 (4th Cir.), cert. denied, 518 U.S. 1036 (1996). In Savino, as here, Dr. Centor relied on the defendant's statements in forming his opinion about the defendant's future dangerousness. We held any constitutional error harmless because: (1) the Commonwealth presented other "compelling evidence" as to the defendant's "prior criminal record and his own statements as to his criminal history," (2) the "nature of the crime and circumstances surrounding it . . . revealed viciousness and dangerousness," (3) Dr. Centor relied on other factors, in addition to the defendant's statements, in reaching his opinion, and (4) Dr. Centor never disclosed any statement made by the defendant. Id. at 605.

Stewart maintains that Savino does not control here because in this case Dr. Centor acknowledged on direct examination that his assessment was based in part on Stewart's own statements, while in Savino Dr. Centor's reliance on the defendant's statements did not surface until a defense expert read aloud a portion of Dr. Centor's report. The cases are factually different but it is a difference of no legal signifi-

17

cance. Virginia law bars introduction of a defendant's statements and "evidence _derived_ from any such statements." Va. Code 19.2-264.3:1(G). Thus, whether or not Dr. Centor testified as to his reliance on a defendant's statements in reaching his opinion is irrelevant--it is that reliance itself that violates the statute (and, according to Stewart, the Constitution). In sum, the error here was identical to that in _Savino_.

Moreover, every factor demonstrating harmlessness noted in _Savino_ is present here. As in _Savino_, here Dr. Centor never revealed any statement made by the defendant. Furthermore, as he did in _Savino_, Dr. Centor testified that he did not rely exclusively on the defendant's statements. Instead, the doctor reviewed numerous outside sources, including reports as to Stewart's criminal history, police reports, autopsy reports, statements Stewart made to police officers, statements of other witnesses and the circumstances surrounding the murders. The government, as it did in _Savino_, presented at sentencing "compelling evidence" of the defendant's "prior criminal record and his own statements of criminal history." _Id._ We note that Stewart's criminal history includes a conviction for assaulting a police officer with a knife. Finally, the nature and circumstances of the killings performed by Stewart, like those performed by Savino, "revealed viciousness and dangerousness." _Id_. Stewart not only brutally killed his wife and their infant son, but also acted with guile and deliberation, stealing a gun and a car in the process. "[U]nder Virginia law, the circumstances of the criminal offense in and of themselves may constitute sufficient evidence of future dangerousness." _Id_. (citing Va. Code 19.2-264.4(C) (Michie 1995)).

Thus, as we did in _Savino_, we conclude that reliance on the defendant's statements in this case "would probably have had little if any impact on Dr. Centor's assessment." _Id_. Any error was harmless because it cannot be said to have had a "substantial and injurious effect or influence in determining the verdict." _Brecht v. Abrahamson_, 507 U.S. 619, 623 (1993).

VII.

Finally, Stewart contends that the imposition of the death penalty on him was disproportionate to the penalty imposed in similar cases.

18

Stewart asserts that his due process and equal protection rights were violated by the manner in which the Supreme Court of Virginia conducted the proportionality review.

No proportionality review is constitutionally mandated. Pulley v. Harris, 465 U.S. 371 (1984). However, Virginia law requires the Virginia Supreme Court to review the record in order to examine whether disproportionality exists in imposing the death sentence. Va. Code 17-110.1(C)(2) (Michie 1996). The court must determine"[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Id.

Even if the state court had erred in its conclusion as to proportionality, this error would provide no basis for federal habeas relief. As we have previously stated, "this court may not issue a writ of habeas corpus on the ground that the [Virginia] Supreme Court has made an error of state law." Peterson v. Murray, 904 F.2d 882, 887 (4th Cir. 1990) (quoting Shaw v. Martin, 733 F.2d 304, 317 (4th Cir.), cert. denied, 469 U.S. 873 (1984)).

In any event, the Virginia Supreme Court did conduct a proportionality review in this case and did not err in concluding that "Stewart's sentence of death was neither excessive nor disproportionate." 427 S.E.2d at 410. The court explicity rejected Stewart's sole argument "that there were no recent Virginia cases `where the death penalty has been imposed under circumstances similar to the one at the case at bar.'" Id. at 410. The court pointed out that if it accepted Stewart's proportionality test, "a death sentence could never be imposed where there are no previous cases similar to the one at bar." Id. Moreover, the Virginia Supreme Court noted that in compiling and reviewing all capital penalty cases "as a guide to determine whether Stewart's death sentence is excessive or disproportionate," the court found "a number of cases in which the capital penalty was based upon the `vileness' predicate, as in Stewart's case." Id.

VIII.

For all of these reasons, the judgment of the district court dismissing Stewart's petition for a writ of habeas corpus is, in all respects

AFFIRMED.

19